STATE of Missouri, Respondent,

v.

Stephen Paul MAGINNIS, Appellant.

No. WD 62896.

Missouri Court of Appeals,
Western District.

Sept. 28, 2004.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 2, 2004.

Application for Transfer Denied
Dec. 21, 2004.

Margaret Mueller Johnston, Asst. Public
Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen.,
Leslie E. McNamara, Asst. Attorney General, Jefferson City, MO, for respondent.

**118**

Before JAMES M. SMART, JR., P.J., JOSEPH M. ELLIS, and LISA WHITE HARDWICK, JJ.

PER CURIAM.

Stephen Paul Maginnis appeals his convictions for trafficking in the second degree, § 195.223, RSMo.2000, and possession with intent to distribute, § 195.211, RSMo.2000, for which he received concurrent prison sentences of eighteen years and twelve years, respectively. Maginnis asserts that the trial court erred in overruling his motion to suppress and in admitting the evidence that led to his conviction because it was obtained as the result of an unlawful search and seizure.

### Statement of Facts

The evidence is viewed in the light most favorable to the trial court's judgment. At 3:30 p.m. on February 28, 2002, while traveling on I–70 in Lafayette County, Appellant Maginnis was pulled over by Corporal Brian Haggerty of the Missouri State Highway Patrol. Haggerty is a canine officer, and his dog was riding in the patrol car that day. According to Haggerty, Maginnis was stopped for the following traffic violations: traveling in the passing lane for seven miles without any surrounding traffic; traveling three miles per hour over the seventy miles-per-hour speed limit; and moving from the passing lane into the right lane without use of a turn signal.

The officer approached Maginnis' vehicle on the passenger side. Maginnis gave the officer a Nebraska driver's license. The officer asked Maginnis to go with him back to the patrol car. Once in the patrol car, the officer asked Maginnis where he was headed. Maginnis said he was traveling from Nebraska to Winter Haven, Florida, to help sort some items that belonged to his recently deceased brother. The officer asked Maginnis if he was from Florida and

questioned him as to how long he would be there. Haggerty then asked Maginnis about his passenger. Maginnis stated that the passenger was going with him to help because Maginnis' mother is handicapped.

Haggerty also asked Maginnis about his employment, whether he was working right now, whether his passenger worked for him, and how long he had known the passenger: Q. Are you working right now? A. Am I working? Q. Are you employed? A. I have my own business, "Tile With Style." Q. You lay tile? Q. Does this guy work for you? Q. How long have you known each other? A. A couple of years. Q. Does he have the registration up there or do you have it with you? Q. Is it in the glove compartment? A. Probably. Q. Let me go have him get it.

Before exiting the vehicle, Haggerty asked Maginnis if he had "any weapons or anything" in his pockets, and Maginnis said he did not.

Corporal Haggerty then returned to Maginnis' vehicle to talk with the passenger. The officer testified that in that "very brief" conversation, he asked the passenger where they were headed. The passenger said he did not know and that he was just headed "up the road." He said they were coming from Nebraska, but he was not sure what city or state he was traveling to. The officer thought the passenger was trying to quickly end the conversation. The officer asked two more times where they were going, and the passenger seemed disinterested in talking. The passenger then told the officer to "talk to the driver and get that information."

Haggerty, of course, found it suspicious that two people coming from the same place, who had known each other for several years, did not both know where they were going. He also was suspicious because the passenger acted frustrated or

defensive and was trying to make him "go away." At some point, Haggerty asked the passenger for identification and was given a copy of a Colorado birth certificate. The passenger also gave the officer an insurance card he had found in the vehicle, and the officer returned to the patrol car.

Upon returning to the patrol car, Haggerty again asked Maginnis where he and the passenger were coming from, and Maginnis replied Nebraska. When shown the insurance card provided by the passenger, Maginnis told Haggerty that the insurance card was not his. He explained that he keeps his registration and insurance card in a visor-mounted CD holder, and that his must have gotten switched with his wife's. Maginnis offered, "[I]t's all accurate. I mean, if you want to write me a ticket to make sure that I come back here and show you guys that I have all that stuff...." He commented that he did not feel too smart for being on the road without his registration and proof of insurance. The officer replied that he is "not interested in just handing out tickets and handing out tickets."

The officer then asked Maginnis if they had any luggage with them, how much luggage they had, and which bags belonged to whom. He informed Maginnis that the passenger said he did not know where or even what state they were going to. Indicating surprise, Maginnis stated, "What in the world is he thinking? He knows where we're going." The officer told Maginnis that the passenger's comments made him uneasy. Maginnis asked to go with the officer to speak to the passenger, but the officer refused, stating, "I want to find out what [the passenger's] deal is."

Corporal Haggerty testified later that he was suspicious of Maginnis' demeanor, in "that nothing was really bothering him."

Haggerty also stated that Maginnis was "overly apologetic," and that Maginnis' level of anxiety rose after Haggerty returned to the patrol car after speaking with the passenger. Haggerty found it suspicious that Maginnis offered an explanation as to why his registration was not in the vehicle. Haggerty also thought the passenger was odd because he was not conversational.

In Haggerty's Probable Cause Affidavit, dated February 28, 2002, and filed March 1, 2002, the only basis for reasonable suspicion was the inconsistent statements of the driver and passenger regarding the purpose and destination of their trip.

Haggerty asked Maginnis for consent to search the vehicle and told him he would just have his dog sniff the car if he refused. Maginnis declined to consent, saying he did not think it was necessary. Maginnis had been in Haggerty's patrol car for a little over ten minutes at this point. Before exiting the vehicle, the officer had Maginnis empty his pockets. The officer then returned to Maginnis' vehicle and directed the passenger to exit the vehicle, empty his pockets, and then walk away from the vehicle some distance down the highway. Haggerty then got his dog out of his vehicle and proceeded to Maginnis' vehicle.

The dog indicated that there were drugs in the car by scratching on the trunk near the keyhole. Haggerty called for assistance. Haggerty told Maginnis that the dog indicated there were drugs in the car, which gave him "probable cause" to search the vehicle. Maginnis offered that there had "been dope smoked in that car before ... there's a roach in the ashtray, I might as well tell you now."

Other officers arrived on the scene. The passenger was placed in another patrol car. One of the other officers asked Maginnis if everything was current on his

driver's license, and, at that point, radioed in the license for information on Maginnis and his passenger. The radio report came back that Maginnis' license was "valid through Nebraska, 2005." This was the first attempt to verify the accuracy of Maginnis' license.

In the search of Maginnis' vehicle, Haggerty found rolling papers and two white powder rocks located in the pocket of a shirt on the driver's seat. He placed Maginnis and the passenger under arrest at this point. In the trunk, he found a bag containing drug paraphernalia and a safe containing a handgun and a substantial quantity of substances that appeared to be drugs. The substances in the safe were later determined to be marijuana and methamphetamine.

Maginnis was charged with the class A felony of trafficking in the first degree and the class B felony of possession of a controlled substance with intent to distribute, deliver, or sell. He was charged as a prior drug offender.

Maginnis filed a motion to suppress the evidence found in his vehicle. A hearing was held, and the motion was denied. In an amended information, the trafficking charge was reduced to second-degree trafficking. Maginnis waived his right to a jury trial, and a bench trial was held. Maginnis was found guilty on both counts and sentenced by the court. In his motion for judgment of acquittal or for new trial, Maginnis raised the trial court's error in admitting the evidence seized in the search of his vehicle. He alleged that the evidence was the fruit of an unlawful search and seizure in violation of his constitutional rights. The motion was denied, and Maginnis now appeals.

### Unlawful Search and Seizure

■ Maginnis asserts that the trial court erred in admitting the evidence seized from his vehicle during the traffic stop. Maginnis contends that his Fourth Amendment right to be free from unreasonable searches and seizures was violated because (1) the officer's questioning went far beyond the purpose of the traffic stop and (2) the officer did not have objective, reasonable suspicion of further criminal activity to justify detaining Maginnis in order to conduct a drug-dog sniff of his vehicle.

■ In this case, the officer's questioning of Maginnis in the patrol vehicle was captured in its entirety on the audio portion of the videotape. There is no factual issue as to the content of the conversation. Because this court has a front row seat (so to speak) as to the exchange between the officer and Maginnis, we need not defer to the officer's characterization of Maginniss' comments and demeanor. Whether the Fourth Amendment has been violated is a matter of law that we review *de novo* in light of the undisputed facts. *State v. Davalos*, 128 S.W.3d 143, 147 (Mo.App. 2004).

■ Maginnis points out that Missouri law allows only limited questioning by an officer during a traffic stop. The officer may ask questions beyond the scope of the stop only if there is an objectively reasonable suspicion of criminal activity. *State v. Slavin*, 944 S.W.2d 314, 318 (Mo.App.1997); *State v. Bradshaw*, 99 S.W.3d 73, 77 (Mo.App.2003). During a traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. *Bradshaw*, 99 S.W.3d at 77. As long as the officer is investigating these items, running the records check, and issuing a citation, the officer may continue to conduct a reasonable investigation of the traffic violation by conversing with the driver.

*See State v. Watkins*, 73 S.W.3d 881 (Mo. App.2002).

The evidence here shows that even if the initial stop was about infringement of traffic laws, the interrogation of the two travelers was not at all about traffic violations, but rather was about the officer's desire to obtain the opportunity to flush out any possible drug activity. Thus, our inquiry must focus on whether the detention and questioning for such a purpose under these circumstances were permissible under Fourth Amendment standards.

The officer promptly began the unrelated questioning, even though Maginnis, who produced his license, had done nothing other than commit common minor traffic violations. The officer questioned Maginnis as to his trip purpose and destination, and also the expected length of the trip and whether Maginnis formerly lived in Florida. He also asked about Maginnis' employment, his passenger, the passenger's employment, and how long he had known the passenger. The initial interrogation of Maginnis in the patrol car did nothing we could determine to create any suspicion. In our review of the audio of that interrogation, we failed to detect anything unusual in Maginnis' mannerisms or responses. Maginnis seemed relatively relaxed, and not particularly anxious. He sounded cooperative and conversational, not upset or discouraged about being stopped, and maybe slightly given to a light-hearted disposition. Even if that were grounds for reasonable suspicion, we fail to see that Maginnis' demeanor under the extended questioning was pertinent in view of the fact that the substantial interrogation itself was not germane to the stop.

Maginnis contends that under the Fourth Amendment it is not reasonable for the officer, in a routine traffic stop, to detain travelers for the purpose of interrogation on matters unrelated to the traffic violation, without, at that point, having any reasonable, articulable grounds for suspicion of illegal activities. We agree.

Reasonable suspicion must be based on specific articulable facts indicating that criminal activity is afoot. *State v. Woolfolk*, 3 S.W.3d 823, 829 (Mo.App.1999). "Reasonable suspicion" must be more than an inchoate hunch. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). An investigative detention pursuant to a stop must "last no longer than is necessary to effectuate the purpose of the stop," and "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). An officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. *See United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993).

Here, the officer's detention of Maginnis and his companion had nothing to do with excessive speed or improper lane usage. Maginnis promptly produced his license. The officer decided to engage in questioning unrelated to the traffic stop. This is not a case in which the officer, while in the process of investigating license and registration, was also engaged in casual discussion of the destination or nature of the trip. Here, the officer did not ask about registration papers until after he had finished questioning Maginnis about unrelated matters, almost a full four minutes (according to the video tape) after the officer first commenced discussion with Maginnis in the patrol car.

In *United States v. Pruitt*, 174 F.3d 1215, 1217–18 (11th Cir.1999), a driver named Pena was stopped for speeding.

The officer asked Pena to step out of his van and accompany him to the rear of the van. After advising Pena he was speeding, the officer asked Pena his age and whether he owned the van. They went to the police car. There the officer asked questions unrelated to the stop, such as where Pena's family resided. The officer then left to retrieve Pena's registration and insurance papers from the van. While at the van, he asked the passengers who they were, who they were planning to visit in Memphis, and what the street address was. The officer then returned to the police vehicle and asked Pena to identify the passengers, how much he paid for the van, what kind of work he did for a living, whether one of the passengers was his brother, and why they had different last names. After Pena refused to consent to a search, the officer requested that a drug dog be brought to the scene. The dog indicated the presence of drugs, and the van was searched. The court, in reversing the convictions, stated:

> At the time Pena ... and the others were stopped, [the officer] had before him evidence of speeding. His questioning following the stop, therefore, should have been directed to securing Pena's license, registration and insurance papers. Once such brief questioning was completed, Pena and the others should have been free to go, as [the officer] was provided at that time with no reasonable suspicion of their criminal activity. In such circumstances, additional "fishing expedition" questions such as "What do you do for a living?" and "How much money did your van cost?" are simply irrelevant, and constitute a violation of *Terry [v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)].

*Pruitt,* 174 F.3d at 1221.

In this case, Officer Haggerty, who had a drug dog with him, diverted immediately from enforcement of the traffic laws and undertook, presumably on a hunch, to question the travelers until articulable suspicion developed. The officer's "fishing expedition" questions went well beyond enforcement of the traffic laws. As already noted, the officer did not even ask for registration, or run a computer check of license or vehicle, until after the unrelated questioning.

While the unrelated questioning might have seemed reasonable to Haggerty based on his hunch (and, indeed, his hunch turned out to be accurate), the question before us is whether the Fourth Amendment permits such unrelated questioning as a routine part of a traffic stop. At the time the officer launched the unrelated questioning, it was still a routine traffic stop with no articulable ground for suspicion. There was no grounds for suspicion of driving while intoxicated or any other criminal activity. We are aware of no authority that approves such unrelated questioning in a routine traffic stop as being within the "reasonableness" standards of the Fourth Amendment. We conclude that under the established standards of the Fourth Amendment, the officer's questions delayed the resolution of the traffic violation and impermissibly detained Maginnis beyond what was reasonable in view of the nature of the stop.

We hold that the evidence was improperly seized and should have been excluded. In view of the extant authority, the trial court erred. Without the improperly seized items in evidence, there was insufficient evidence to convict. We have no choice but to reverse the conviction.

The judgment is reversed.