STATE of Missouri, Respondent,

v.

Melvin STOVER, Jr., Appellant.

No. SC 91760.

Supreme Court of Missouri,
En Banc.

Sept. 25, 2012.

Daniel L. Viets, Columbia, MO, for Appellant.

Evan J. Buchheim, Attorney General's Office, Jefferson City, MO, for Respondent.

PATRICIA BRECKENRIDGE, Judge.

Melvin Stover, Jr., appeals his conviction and sentence of 12 years without probation or parole for the class A felony of trafficking drugs in the first degree, section 195.222.5.[1] On appeal, Mr. Stover claims that the trial court erred in overruling his motion for acquittal because there was insufficient evidence to prove he knowingly possessed the illegal drugs, overruling his motion to suppress evidence because he was detained without reasonable suspicion of criminal activity, and in overruling his objections to evidence of the incriminating statements he made before he received *Miranda* warnings.[2] He further claims that the trial court erred in overruling his objection to the verdict-directing instruction. Because the submission of the verdict director was plain error, the judgment is reversed and the cause remanded.

## Facts and Procedural Background

Missouri State Highway Patrol Corporal Brian Hagerty has worked in drug interdiction with the highway patrol since 1998 and has been the supervisor of his troop's "Criminal Interdiction Unit" since 2001. By November 2003, the veteran trooper had made "hundreds, if not thousands, of drug interdiction arrests" during his career. Most of the significant drug seizures he has made occurred on eastbound Interstate 70.

The morning of November 25, 2003, Corporal Hagerty and another trooper were patrolling Interstate 70 in Lafayette County. During the patrol, Corporal Hagerty noticed a 2004 Mercury Grand Marquis traveling eastbound on Interstate 70 in front of his patrol car. Corporal Hagerty observed the Grand Marquis, which was occupied by two males, move from the left lane into the right lane between two tractor-trailers. Corporal Hagerty noted that the vehicle was traveling at 65 miles per hour and following fewer than two car lengths behind the first tractor-trailer. Corporal Hagerty pulled his patrol car in front of the second tractor-trailer and behind the Grand Marquis. From behind the Grand Marquis, Corporal Hagerty could see that the vehicle had California license plates. The Grand Marquis then slowed to an approximate 55 miles per hour in the 70–mile–per–hour zone. His observation of the vehicle and its occupants and the driver's reaction to the patrol car caused Corporal Hagerty to suspect the two men were engaged in illegal activity.

Corporal Hagerty activated his emergency lights to stop the vehicle for following the tractor-trailer too closely. The stop occurred shortly after 10:54 a.m. near an exit ramp to a rest area in Lafayette County. Corporal Hagerty and his fellow trooper approached the vehicle to speak with the two male occupants. During his approach, Corporal Hagerty suspected that the vehicle was a rental car based of

---

1. All references are to RSMo Supp.2008, unless otherwise indicated.

2. *Miranda* warnings must be provided when a person is subjected to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the tint of the windows, its clean condition, and the lack of dealership markers or license plate brackets that are typically present on other vehicles. As Corporal Hagerty continued to approach the vehicle, he looked into the window and noticed several gift bags and pieces of art work in the passenger compartment, some of which appeared to be newly purchased with price tags still attached. He saw no evidence of any luggage, toiletries, or any other items that might indicate vacation travel. Corporal Hagerty contacted the driver and passenger, explained the reason for the stop, and requested the license of the driver, Mr. Stover.

After receiving Mr. Stover's Washington, D.C., license, Corporal Hagerty asked Mr. Stover to sit in the patrol car. Mr. Stover agreed, exited the Grand Marquis, and entered the patrol car with Corporal Hagerty and the other trooper. Mr. Stover's traveling companion, Oris Butler, remained in the Grand Marquis. Corporal Hagerty obtained the information from Mr. Stover necessary to process the traffic stop and also engaged in general conversation with Mr. Stover. Their conversation, which was recorded by a video camera in the patrol car, caused him to become increasingly suspicious that Mr. Stover and Mr. Butler were trafficking narcotics.

During the conversation in the patrol car, Mr. Stover told Corporal Hagerty that he was returning from Las Vegas, Nevada, to his home in Washington, D.C. He said he and Mr. Butler had flown to Las Vegas for a single day of gambling on Saturday, November 22, which was three days before the traffic stop. Mr. Stover told Corporal Hagerty that each man purchased his own one-way airplane tickets for approximately $900. When Corporal Hagerty asked Mr. Stover why no luggage was visible in the vehicle, Mr. Stover said he had not brought any luggage because he and Mr.

Butler only planned to be in Las Vegas for one day. During their conversation, Corporal Hagerty said that D.C. had unusual licenses and that he was slow to get a response in the car on his laptop computer.

While waiting, Corporal Hagerty and Mr. Stover discussed the Las Vegas trip in more detail. Corporal Hagerty learned that the two men gambled at MGM Grand but that, instead of staying there, they stayed at a cheaper hotel down the street. Mr. Stover told Corporal Hagerty that he initially won $2,000 but that he then lost all but $600. As a result, Mr. Stover said that they were unable to purchase tickets for a return flight and instead rented the vehicle to drive back to Washington, D.C. Finally, when Corporal Hagerty asked if either he or Mr. Butler had been arrested in the past, Mr. Stover said he had not and, when asked about Mr. Butler, Mr. Stover said Mr. Butler had not been arrested "in the last four to five years."

Corporal Hagerty then informed Mr. Stover that he was going to return to the Grand Marquis to retrieve the vehicle rental agreement from Mr. Butler. While doing so, Corporal Hagerty obtained Mr. Butler's Maryland identification. He also asked Mr. Butler some of the same questions he had asked Mr. Stover in the patrol car. When questioned, Mr. Butler's previously calm demeanor changed, and he became animated. In addition, Mr. Butler's answers to several questions were different than Mr. Stover's answers. For example, Mr. Butler told Corporal Hagerty that he and Mr. Stover left Washington, D.C., on Friday, when Mr. Stover said they flew out on Saturday. Mr. Butler told Corporal Hagerty the pair was driving back east because they got "hung up" in Las Vegas and wanted to see the country. In contrast, Mr. Stover said they were driving back due to lack of money. Furthermore, the rental agreement Corporal Hagerty

obtained from the Grand Marquis showed Mr. Stover rented the car in Las Vegas on November 21, 2003, the day before Mr. Stover said he had arrived in Las Vegas. The vehicle was due in Washington, D.C., on November 24, 2003, making the vehicle one day overdue at the time of the stop. Corporal Hagerty then returned to the patrol car.

On his return, Corporal Hagerty initiated a radio check of Mr. Butler's identification and learned that Mr. Butler had been arrested several times for drug-related offenses. At this point, Corporal Hagerty asked Mr. Stover if the vehicle contained anything illegal. Mr. Stover replied that there was nothing illegal in the car and began asking why he had been stopped. At approximately 11:14 a.m., 20 minutes after the stop began, Corporal Hagerty asked for consent to search the vehicle. Mr. Stover firmly refused, and, according to Corporal Hagerty, his speech became strained and his demeanor became argumentative. Corporal Hagerty told Mr. Stover that he intended to call in a canine unit, and Mr. Stover asked why that was necessary. As Corporal Hagerty began to explain, Mr. Stover interrupted him, saying for the first time that he needed to get home as soon as possible because his mother soon would be admitted to a Washington, D.C., hospital. Mr. Stover continued talking to Corporal Hagerty, which prevented Corporal Hagerty from calling for the canine unit for approximately six minutes. At 11:20 a.m., approximately 26 minutes after initiating the stop, Corporal Hagerty successfully requested a canine unit by radio.

After the request for a canine unit, Mr. Stover asked if Corporal Hagerty would get him a cigarette from the rental car. Corporal Hagerty said he would and returned to the Grand Marquis. While there, Corporal Hagerty asked Mr. Butler about Mr. Stover's statement regarding his ill mother. Mr. Butler stated that he did not know of any illness in Mr. Stover's family. Mr. Butler also told Corporal Hagerty that there were no cigarettes in the vehicle and that Mr. Stover did not smoke.

Corporal Hagerty returned once more to the patrol car to confront Mr. Stover with what he believed were contradictions between the two men's statements. Mr. Stover suggested that everything he had told the officer made sense, and Corporal Hagerty said he disagreed. Mr. Stover then changed his story to say that Mr. Butler was correct that they flew out on November 21. He also stated for the first time that a third man was with them in Las Vegas, although he never identified that person. At 11:33 a.m., approximately 40 minutes after the stop, Corporal Hagerty called to check on the status of the canine unit.

At 11:39 a.m., 19 minutes after Corporal Hagerty radioed for the canine unit, it arrived at the scene. After the canine had acclimated to its surroundings, it performed a sniff test of the Grand Marquis and "alerted" at the trunk. Corporal Hagerty announced that he was going to conduct a search, and he opened the trunk. Corporal Hagerty found a large suitcase in the trunk, which was opened to reveal 11 plastic bottles containing a yellowish liquid that later was determined to be approximately 10 gallons of PCP, a controlled substance. Corporal Hagerty also found a newly purchased watch in a gift bag in the trunk near the suitcase. The troopers arrested Mr. Stover and advised him of his *Miranda* rights. Corporal Hagerty then called a tow truck to move the Grand Marquis to a safe location at a scale house off the highway. At the scale house, Mr. Stover told the officer who responded with the canine that he owned the Fossil watch

found in a gift bag in the trunk next to the suitcase containing the PCP.

Thereafter, the men were taken to the Lafayette County jail. When Mr. Butler was searched during booking, a JetBlue flight itinerary in Mr. Butler's name and a ticket stub were recovered from his person. The itinerary and ticket stub were for a one-way fare of $259 from Washington, D.C., to Long Beach, California, on Thursday, November 20, 2003. When the troopers conducted an inventory of the rental vehicle, they found a receipt for a flight on Southwest Airline in Mr. Butler's name from Los Angeles International Airport to Las Vegas on Friday, November 21, 2003. The troopers also found a vehicle condition report showing that Mr. Stover had inspected the vehicle for damage at the time he rented it.

On February 1, 2007, the state charged Mr. Stover with first-degree trafficking, a class A felony, under section 195.222.5. Prior to trial, Mr. Stover filed a motion to suppress the contraband seized during the search, the evidence of incriminating statements made during the traffic stop, and the evidence of his refusal to consent to the search.[3] At a hearing on the motion to suppress, Corporal Hagerty testified as to the timeline of events. He acknowledged that Mr. Stover was not free to leave at any time throughout the detention. After the hearing, the trial court overruled Mr. Stover's motion to suppress. At trial, the state presented evidence that the DEA publicly commended Corporal Hagerty for the drug seizure. The trial court admitted this evidence over Mr. Stover's hearsay objection. During the jury instruction conference, Mr. Stover objected to the definition of "possession" in the state's verdict director. The court overruled the objec-

tion and submitted the state's instructions to the jury. After deliberations, the jury found Mr. Stover guilty. The trial court overruled Mr. Stover's motion for judgment of acquittal based on the state's failure to provide sufficient evidence of knowing possession of the contraband. The trial court sentenced Mr. Stover to twelve years in prison without the possibility of probation or parole. Mr. Stover appealed. This Court granted transfer after opinion by the court of appeals. Mo. Const. art. V, sec. 10.

On appeal, Mr. Stover claims that the trial court erred in: (1) overruling his motion for acquittal on the ground of insufficient evidence to convince a reasonable trier of fact that he knowingly possessed the contraband; (2) overruling his motion to suppress the contraband seized during the search of his vehicle because the detention was conducted without reasonable suspicion of criminal activity and lasted beyond the time reasonably required to complete a traffic ticket; (3) overruling his motion to suppress evidence of incriminating statements made during the detention and prior to the arresting officers issuing a *Miranda* warning; (4) allowing into evidence his refusal to consent to a search of the vehicle; (5) allowing Corporal Hagerty's testimony that he received a commendation from the DEA for making the largest PCP seizure in the history of the United States until 2003; and (6) overruling his objection to the verdict-directing instruction because it did not require the jury to find that he knew of the content and character of the PCP or that he was aware of its presence and nature. For ease of discussion, some of Mr. Stover's points will be addressed out of order.

---

3. The motion to suppress initially was filed in Lafayette County. After venue was changed to Clay County, an identical motion to sup-

press was filed in Clay County. Because the motions were identical, they will be referred to as one motion.

## Conviction Supported by Sufficient Evidence

■ On appeal, Mr. Stover first contends that the trial court erred in overruling his motions for a judgment of acquittal because there was insufficient evidence to support a conviction of trafficking drugs in the first degree. He claims that the state did not produce sufficient evidence to convince a reasonable trier of fact that he knowingly possessed the PCP.

■ When reviewing whether sufficient evidence supports a criminal conviction, this Court gives great deference to the trier of fact. *State v. Moore*, 303 S.W.3d 515, 519 (Mo. banc 2010). Appellate review "is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Oliver*, 293 S.W.3d 437, 444 (Mo. banc 2009) (quoting *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998)). In applying this standard, "the Court accepts as true all of the evidence favorable to the state including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary." *Id.*

■ Mr. Stover was charged with first-degree trafficking in violation of section 195.222.5, RSMo Supp.2011, which provides:

A person commits the crime of trafficking drugs in the first degree if . . . he distributes, delivers, manufactures, produces or attempts to distribute, deliver, manufacture or produce more than thirty grams of a mixture or substance containing a detectable amount of phencyclidine (PCP).

In support of the first-degree trafficking charge, the state alleged that Mr. Stover possessed ninety grams or more of the controlled substance and such conduct was a substantial step toward committing the crime by attempting to distribute, deliver, or sell the controlled substance to another person. On appeal, Mr. Stover contends that there was insufficient evidence to prove that he knowingly possessed the PCP. Although possession of the PCP is not an element of the crime of first-degree trafficking, evidence of knowing possession may support the conviction when the state alleges that the defendant attempted to distribute, deliver, manufacture or produce the controlled substance, and this evidence may be circumstantial. *See State v. McNaughton*, 924 S.W.2d 517, 526 (Mo. App.1996), *overruled on other grounds by State v. Pond*, 131 S.W.3d 792, 794 (Mo. banc 2004); *State v. Wilson*, 359 S.W.3d 60, 67 (Mo.App.2011) (evidence of possession was sufficient to establish that defendant was aware of the nature of controlled substance being produced in the house in which defendant was present when police executed search warrant). Substantial evidence that Mr. Stover possessed the contraband, then, will supply the requisite knowledge of its presence to support a conviction for trafficking in the first degree.

The legislature defined the word "possessed" or the phrase "possessing a controlled substance" to mean:

A person, with the knowledge of the presence and nature of a substance, has actual or constructive possession of the substance. A person has actual possession if he has the substance on his person or within easy reach and convenient control. A person who, although not in actual possession, has the power and intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession of it.

Section 195.010(34), RSMo Supp.2011.

■ To prove possession of a controlled substance, the state must show con-

scious and intentional possession of the substance, either actual or constructive, and awareness of the presence and nature of the substance. *State v. Purlee*, 839 S.W.2d 584, 587 (Mo. banc 1992). Proof of a defendant's knowledge often is supplied by circumstantial evidence of the acts and conduct of the defendant that permit an inference that he or she knew of the existence of the contraband. *Id.* "Proof of constructive possession requires, at a minimum, evidence that defendant had access to and control over the premises where the substance was found." *Id.* at 588. Exclusive control over the premises raises an inference of possession and control. *Id.* However, when there is joint control over the premises where the drugs are discovered, some further evidence or admission must connect the accused with the illegal drugs. *Id.*

▇ "In cases involving joint control of an automobile, 'a defendant is deemed to have both knowledge and control of items discovered within the automobile, and, therefore, possession in the legal sense, where there is additional evidence connecting him with the items.'" *State v. Woods*, 284 S.W.3d 630, 640 (Mo.App.2009) (quoting *State v. Sanderson*, 169 S.W.3d 158, 164 (Mo.App.2005)). "This additional evidence must demonstrate sufficient incriminating circumstances to permit the inference of a defendant's knowledge and control over the controlled substance." *Id.* The *Woods* court listed additional incriminating circumstances that could support an inference of knowledge and control of the items:

Finding a large quantity of drugs in the vehicle;

Finding drugs having a large monetary value in the vehicle;

Easy accessibility or routine access to the drugs;

The odor of drugs in the vehicle;

The presence of the defendant's personal belongings in close proximity to the drugs;

Making false statements in an attempt to deceive the police;

The defendant's nervousness during the search;

The defendant's flight from law enforcement;

The presence of drugs in plain view;

Other conduct and statements made by the accused; and

The fact that the defendant rented the vehicle.

*Id.*

Because Mr. Stover did not have exclusive control of the vehicle, the state was required to present additional incriminating evidence in order to prove knowledge and control sufficient to support a finding of possession of the controlled substance. Mr. Stover contends that there was no evidence that he was shaking or exhibited unusual nervousness, no incriminating statements concerning the drugs, and that the drugs were not in plain view when he was in the vehicle. Mr. Stover further states that the drugs were not commingled with any of his belongings. The state contends that it showed at trial sufficient additional evidence to connect Mr. Stover to the contraband. The issue, therefore, is whether the state presented sufficient evidence of incriminating circumstances in order to permit an inference of Mr. Stover's knowledge and control over the drugs. These factors from *Woods*, while not exhaustive, guide this Court's analysis of whether additional incriminating circumstances sufficiently connected Mr. Stover to the PCP in the trunk of the car.

Based on the evidence presented at trial, the state met its burden to show additional incriminating circumstances to support an

inference of Mr. Stover's knowledge and control over the controlled substance in the vehicle. A state laboratory technician testified that there was a large quantity, approximately 10 gallons, of PCP in the bottles found in the trunk. Further testimony established that 10 gallons of PCP amounts to approximately 37,850 doses, which supports a conclusion that the drugs had a large monetary value. As the named customer on the rental agreement and the driver of the vehicle, it is reasonable for a jury to infer that Mr. Stover had easy access to the trunk where the drugs were found.

Significantly, the trooper who responded with the canine testified that Mr. Stover admitted to ownership of the Fossil watch found in the trunk next to the PCP. Although Mr. Stover denied ever accessing the trunk, he could not explain how his newly purchased watch came to be in the trunk next to the suitcase full of PCP. This additional evidence supports the inference that Mr. Stover had knowledge and control of the drugs.

Further, the evidence at trial was that Mr. Stover made false statements to Corporal Hagerty, such as telling him that he and Mr. Butler had arrived in Las Vegas a day later than Mr. Stover actually had. Inconsistencies in the stories told to Corporal Hagerty, such as Mr. Stover stating that they had to rent a vehicle due to their lack of funds and Mr. Butler stating that they got "hung up" in Las Vegas and wanted to see the country, were evidence that the men were making false statements in an attempt to deceive Corporal Hagerty. According to Corporal Hagerty's testimony at trial, Mr. Stover exhibited physical symptoms of anxiety during the vehicle stop, such as the pulse visibly beating on the side of his neck. When Corporal Hagerty requested Mr. Stover's consent to search the vehicle, his demean-

or changed: His hands became animated, and his tone became argumentative. Consistent with Corporal Hagerty's experience that drug trafficking often is accomplished by traveling in a rental vehicle, Mr. Stover rented the Grand Marquis that served to transport the PCP in this case.

Importantly, the state admitted into evidence receipts and ticket stubs from Mr. Butler's travel that show he flew from Washington, D.C., to Long Beach, California, on Thursday, November 20, and then from Los Angeles International Airport to Las Vegas on Friday, November 21. This evidence shows that all the statements made by Mr. Stover and Mr. Butler as to their joint travel from Washington, D.C., to Las Vegas on either Friday, November 21, or Saturday, November 22, were false and demonstrates an intent by the two men to deceive Corporal Hagerty.

The record contains substantial evidence linking Mr. Stover to the controlled substance in the trunk beyond his presence in the vehicle of which his name was listed as the customer. Mr. Stover's knowing possession of the PCP reasonably may be inferred. The trial court did not err in overruling his motion for acquittal.

## Reasonable Suspicion Existed for Investigative Detention

For his next point on appeal, Mr. Stover contends that the trial court erred in failing to sustain his motion to suppress the evidence obtained as a result of the traffic stop because the detention was without reasonable suspicion of criminal activity and extended beyond the time reasonably required to complete a traffic ticket. He characterizes the stop as a "prolonged detention" without reasonable suspicion to believe that any criminal activity, other than the traffic violation itself, was occurring.

■ This Court reviews a trial court's ruling on a motion to suppress in the light most favorable to the ruling and defers to the trial court's determinations of credibility. *State v. Schroeder*, 330 S.W.3d 468, 472 (Mo. banc 2011). Review is limited to determining whether the decision is supported by substantial evidence. *Id.* Analysis of whether conduct violates the Fourth Amendment is an issue of law that this Court review *de novo*. *Id.*

■ The Fourth Amendment to the United States Constitution guarantees the right of all citizens to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "A routine traffic stop based on the violation of state traffic laws is a justifiable seizure under the Fourth Amendment." *State v. Granado*, 148 S.W.3d 309, 311 (Mo. banc 2004). Such a seizure is constitutional "[s]o long as the police are doing no more than they are legally permitted and objectively authorized to do." *Id.* An officer has authority to "check the driver's license and registration, ask the driver about his destination and purpose, and request that the driver sit inside the patrol car." *United States v. Brown*, 345 F.3d 574, 578 (8th Cir.2003). But "[t]he fact that the police may detain a person for a routine traffic stop does not justify indefinite detention." *Granado*, 148 S.W.3d at 311. A seizure can become unconstitutional if the detention lasts beyond the time necessary for the officer to conduct a reasonable investigation of the traffic violation. *Id.*

■ An officer may continue to detain the individual beyond the time period necessary to investigate the traffic violation if the officer develops "reasonable and articulable grounds for suspicion of illegal activity" based on the behavior and responses of the individual during the traffic stop. *See State v. Waldrup*, 331 S.W.3d 668, 674 (Mo. banc 2011); *United States v.*

*Lyons*, 486 F.3d 367, 371 (8th Cir.2007) (circumstances that establish reasonable and articulable suspicion that the vehicle is carrying contraband provide justification for greater intrusion unrelated to the traffic offense). "The [reasonable] suspicion that will justify the minimally intrusive '*Terry*' stop is present when 'a police officer observes *unusual conduct* which leads him reasonably to conclude *in light of his experience* that criminal activity may be afoot.'" *Waldrup*, 331 S.W.3d at 674 (quoting *State v. Mack*, 66 S.W.3d 706, 709 (Mo. banc 2002)). "[A] court must examine the totality of the circumstances in order to evaluate whether the standard for "reasonable suspicion" has been met." *Id.*

■ As with the traffic stop investigation, the continued detention must "be strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio*, 392 U.S. 1, 25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *United States v. Place*, the United States Supreme Court "question[ed] the wisdom of a rigid time limitation" because "[s]uch a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1985). In determining whether a traffic stop takes too much time to be justified as investigatory, courts "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.* The officer may ask "a moderate number of

questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicion." *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

■ In this case, Corporal Hagerty had sufficient justification to detain Mr. Stover during his reasonable investigation of the traffic stop and to detain Mr. Stover further and investigate his activities upon attaining reasonable suspicion that criminal activity was afoot. Corporal Hagerty stopped the Grand Marquis for following a tractor-trailer in an unsafe manner. During the traffic stop, Corporal Hagerty required Mr. Stover to join him in the patrol car to process the traffic ticket. Corporal Hagerty testified that Mr. Stover's Washington, D.C., license delayed the process for issuing the traffic warning. In the meantime, Corporal Hagerty engaged in general conversation with Mr. Stover and Mr. Butler about their trip and plans.

Corporal Hagerty's continued detention of Mr. Stover was justified because the circumstances supported an objective reasonable suspicion that criminal activity was occurring. Specifically, Corporal Hagerty noted that the men were driving eastbound on 1–70 in a brand new rental car with California license plates. They said they had purchased one-way tickets and were traveling without luggage. After talking with Mr. Stover and Mr. Butler, Corporal Hagerty noticed several discrepancies between their stories. The statements disagreed about the date Mr. Stover and Mr. Butler traveled to Las Vegas. Mr. Stover also told Corporal Hagerty that he rented the Grand Marquis because the two men were unable to afford a return flight after losing money while gambling. The car's rental agreement, however, revealed that Mr. Stover rented the car on November 21, the day before he purportedly flew to Las Vegas and lost money gambling and that the rental car was overdue. Mr. Butler increased Corporal Hagerty's suspicions by asserting they rented the vehicle not because they lost money gambling, but because they wanted to see the country. When Corporal Hagerty confronted Mr. Stover with these conflicting statements, Mr. Stover stated for the first time that he needed to return because his mother was ill, but Mr. Butler did not know of any illness in Mr. Stover's family. Also when confronted, Mr. Stover's speech became strained and, according to Corporal Hagerty, he became argumentative.

Corporal Hagerty testified at trial that the unusual conduct and circumstances of the traffic stop, in light of his experience, led him to conclude that criminal activity may be occurring. Corporal Hagerty testified that many of the actions taken by Mr. Stover are indicative of criminal activity, specifically drug trafficking. Corporal Hagerty testified that 1–70 is a well-recognized drug corridor through the United States. He testified that people engaged in criminal activity overreact upon seeing a law enforcement vehicle, which the officer noted when the Grand Marquis braked to go 15 miles per hour under the speed limit when it already was traveling below the speed limit. Corporal Hagerty also testified that a person's actions of purchasing expensive, one-way airfare, staying for a short period of time, and returning with a different method of transportation often indicates drug trafficking. He found it additionally suspicious in his experience that the men packed no luggage in a cross-country trip and gave inconsistent stories as to their travel itinerary and the reason they rented the car. Under the totality of the circumstances during the traffic stop, it was reasonable for Corporal Hagerty to suspect that illegal activity may be occurring.

■ Once Corporal Hagerty reasonably concluded that criminal activity might have been occurring under the circumstances, he continued to detain Mr. Stover and sought diligently to confirm or dispel his reasonable suspicion. Corporal Hagerty completed both his processing of the traffic violation and confirmation of his suspicions of criminal activity within 20 minutes of the stop and asked Mr. Stover for consent to search the vehicle. After Mr. Stover refused, Corporal Hagerty announced his intention to call a canine unit. Corporal Hagerty was unable to call the canine unit for 6 minutes, however, because Mr. Stover prevented him from doing so by continuously engaging him until Corporal Hagerty asked him to stop talking to him so he could call. After the call to the canine unit, Mr. Stover continued to act in a manner that confirmed the reasonable suspicion of illegal activity. For the first time during the detention, Mr. Stover said he needed to leave because his mother was being admitted into a hospital, an assertion Mr. Butler did not corroborate. Mr. Stover also changed his story to say that the men left for Las Vegas on Friday instead of Saturday. He thereafter asked Corporal Hagerty to get him a cigarette from the Grand Marquis when none existed in the vehicle and Mr. Stover does not smoke. All the while Mr. Stover continuously affirmed Corporal Hagerty's reasonable suspicion, the canine unit was on its way; it arrived 19 minutes after it was called.

Mr. Stover's entire detention—including the traffic stop, the discussions between Mr. Stover and Mr. Butler, and summoning a canine unit—was conducted swiftly and did not last beyond the time necessary for Corporal Hagerty to investigate his reasonable suspicion. *Sharpe,* 470 U.S. at 686, 105 S.Ct. 1568. The detention as a whole lasted for 49 minutes, half of which was the travel time of the canine unit and much of the remaining time was the processing of the traffic ticket and overcoming the delays and requests by Mr. Stover. Many cases find that a near-hour long detention is reasonable if the officer acted diligently to confirm or dispel reasonable suspicion. *See United States v. Maltais,* 403 F.3d 550, 557 (8th Cir.2005); *United States v. Sanchez,* 417 F.3d 971, 975 (8th Cir.2005) (finding a 45 minute detention reasonable when the officer acted diligently to minimize the detention period); *United States v. White,* 42 F.3d 457, 460 (8th Cir.1994) (finding a stop lasting 80 minutes reasonable when the officer radioed for a dog after developing reasonable suspicion and it took some time for the dog to arrive); *United States v. Bloomfield,* 40 F.3d 910, 917 (8th Cir.1994) (finding a 60–minute detention reasonable when the officer was performing a diligent investigation of the reasonable suspicion). Accordingly, the duration of the detention in this case was reasonable.

Mr. Stover relies on *State v. Maginnis,* 150 S.W.3d 117 (Mo.App.2004), and *State v. Sund,* 215 S.W.3d 719 (Mo. banc 2007), to advance his argument that the traffic stop extended beyond the time reasonably required to complete the investigation. Both are distinguishable from this case.

In *Maginnis,* the court of appeals noted that the initial questioning of Mr. Maginnis in the patrol car did nothing to create any suspicion and that the officer conducted a "fishing expedition" without any developed, articulable suspicion. *Maginnis,* 150 S.W.3d at 122. The court found that the officers never had any grounds for suspicion of criminal activity. *Id.* In Mr. Stover's case, the trooper was conducting the routine investigation of the traffic violation while asking questions that were related to Mr. Stover's trip. The responses to those questions developed the reasonable suspicion lacking in *Maginnis.*

In *Sund,* the officer completed the investigation of the traffic violation and returned the license to the driver of the car. 215 S.W.3d at 722. After telling the driver she was free to go and concluding the traffic stop, the officer told the driver to stop and gave her the choice of either consenting to a search or waiting for a canine unit. *Id.* The driver consented to the search, and the officer discovered a significant amount of marijuana in the vehicle. *Id.* The officer admitted that he had no reasonable suspicion of criminal activity that would have justified a search of the vehicle or further detention beyond the time it took to complete the investigation. *Id.* at 723. Under these circumstances, because there was no reasonable suspicion and the traffic stop had been concluded when the officer initiated further detention, the search was unreasonable. *Id.* at 725. Here, Corporal Hagerty's reasonable suspicion was ongoing and escalating throughout the stop.

Corporal Hagerty was justified in asking questions during the investigation of the traffic stop. When he completed the investigation into the traffic violation, he already had developed reasonable suspicion to detain the travelers further. When he asked questions to confirm or dispel these suspicions, the travelers' responses were inconsistent and created additional reasonable suspicion. Officer Hagerty observed specific, articulable facts indicating suspicious behavior from the time of the stop to the time of the arrest, which made the 49–minute window of time between the initial traffic stop and the time the canine made its alert to the trunk of the vehicle not unreasonable under the circumstances of this case. Corporal Hagerty detained Mr. Stover under reasonable suspicion of criminal activity and did not extend Mr. Stover's detention beyond the time necessary to conduct a reasonable investigation. The trial court did not err in overruling Mr. Stover's motion to suppress the evidence obtained as a result of the traffic stop.

### Verdict Director was Plain Error

■ Mr. Stover next asserts that the trial court erred when it overruled his objection to verdict-directing Instruction No. 6 because it did not require the jury to find Mr. Stover knew of the PCP's content and character. He claims the erroneous instruction violated his rights to due process and a fair trial.

Instruction No. 6 was patterned after MAI–CR3d 325.10.2 but omitted the phrase "knowing of the substance's content and character" from the definition of trafficking in the pattern instruction.[4] The

---

4. The full text of Instruction No. 6 reads:

> If you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about November 25, 2003, in the County of Lafayette, State of Missouri, the defendant or Oris Butler, possessed 90 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP), a controlled substance, and
>
> Second, that such conduct was a substantial step toward the commission of the offense of trafficking in the first degree by attempting to distribute, deliver, or sell to another person 90 grams or more of a mixture or substance containing a detect-

> able amount of phencyclidine (PCP), a controlled substance, and
>
> Third, that defendant or Oris Butler engaged in conduct for the purpose of committing such trafficking in the first degree,
>
> then you will find that the offense of trafficking in the first degree has occurred, and if you find and believe from the evidence beyond a reasonable doubt:
>
> Fourth, that with the purpose of promoting or furthering the commission of that trafficking in the first degree, the defendant acted alone or together with or aided Oris Butler in committing the offense;
>
> then you will find the defendant guilty of trafficking in the first degree.

paragraph of Instruction No. 6 defining "trafficking" read: "A person commits the crime of trafficking of a controlled substance if he knowingly distributes, delivers, or sells 90 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP), a controlled substance." Had the instruction mirrored MAI–CR3d 325.10.2, the paragraph would have read: "A person commits the crime of trafficking in the first degree of a controlled substance if he knowingly distributes, delivers, or sells 90 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP), a controlled substance *knowing of the substance's content and character.*'" (Emphasis added).

Rule 28.03 requires "specific objections to instructions . . . considered erroneous" to preserve error for review on appeal. The objection must state "distinctly the matter objected to and the grounds of the objection. . . . The objections must also be raised in the motion for new trial. . . ." *Id.* While Mr. Stover claims he objected timely to Instruction No. 6, his ground for objection at trial differs from his claim of error on appeal. At trial, Mr. Stover's attorney objected that the definitions in

Instruction No. 6 were confusing, and he referenced the definition of "possession," in particular. He said, "Your honor, I recognize that these instructions appear to conform to the approved instructions that have been issued by our state supreme court. It does still seem to me that the definitions of possession and the definitions of, in the form of the instruction, are confusing to the jury and I think unnecessarily so and I will object on that grounds." His objection referenced a different paragraph of Instruction No. 6 than he challenges on appeal. Significantly, he did not object that the instruction failed to conform to MAI–CR3d 325.10.2 or that there was an error in the definition of "trafficking." Because Mr. Stover failed to make the specific objection to the definition of "trafficking" that he raises on appeal, this Court is limited to plain error review. Rule 30.20; *State v. Wurtzberger,* 40 S.W.3d 893, 898 (Mo. banc 2001). The question before this Court, then, is whether Instruction No. 6's omission of the phrase "knowing of the substance's content and character" is plain error.

"A verdict-directing instruction must contain each element of the offense

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

A person commits the crime of trafficking of a controlled substance if he knowingly distributes, delivers, or sells 90 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP), a controlled substance.

As used in this instruction, the term "substantial step" means conduct that is strongly corroborative of the firmness of the defendant's or Oris Butler's purpose to complete the offense of trafficking in the first degree.

As used in this instruction, the term "possessed" means either actual or constructive possession of the substance. A person has

actual possession if he has the substance on his person or within easy reach and convenient control. A person who is not in actual possession has constructive possession if he has the power and intention at a given time to exercise dominion or control over the substance either directly or through another person or persons. Possession may also be sole or joint. If one person alone has possession of a substance, possession is sole. If two or more persons share possession of a substance, possession is joint.

As used in this instruction, controlled substance includes phencyclidine (PCP).

As used in this instruction, a person acts purposely, or with purpose, with respect to the person's conduct or to a result thereof when it is his or her conscious object to engage in conduct or to cause that result.

charged and must require the jury to find every fact necessary to constitute essential elements of [the] offense charged." *State v. Cooper*, 215 S.W.3d 123, 125 (Mo. banc 2007) (citing *State v. Doolittle*, 896 S.W.2d 27, 30 (Mo. banc 1995)). A defendant's due process rights are violated when an instruction relieves the state of its burden to prove the existence of every essential element of the crime and does not require the jury to deliberate on and determine a contested element of the crime. *Id.* at 126. Instructional error rises to the level of plain error when the appellant demonstrates that the trial court "so misdirected or failed to instruct the jury as to cause manifest injustice or miscarriage of justice." *Id.* at 125. Plain error exists when an instruction omits an essential element and the evidence establishing the omitted element was seriously disputed. *Id.* at 126.

This Court previously has found plain error due to a defective verdict director in a criminal case. *See Cooper*, 215 S.W.3d at 123, and *Doolittle*, 896 S.W.2d at 27. In *Cooper*, a defendant was convicted of burglary. At trial, Mr. Cooper disputed whether his entry into the victim's home was unlawful. Though the applicable Missouri Approved Instruction required a jury to find the defendant entered the victim's home "unlawfully," the verdict director at trial omitted the word "unlawfully" and did not require the jury to find Mr. Cooper's entry was unlawful. This Court found "the State had the burden of proving, beyond a reasonable doubt, ... that [the defendant's] entry into [the victim's] house was unlawful." *Id.* It further found that omitting this essential element from the jury instructions relieved the State of its burden and was plain error, requiring reversal of Mr. Cooper's conviction. *Id.* at 127.

In *Doolittle*, Mr. Doolittle was convicted of first-degree robbery, attempted first-degree robbery, and armed criminal action. The jury instructions for the charge of first-degree robbery failed "to define dangerous instrument and it failed to require that the appellant used or threatened the use of the dangerous instrument in the commission of the offense." *Doolittle*, 896 S.W.2d at 29. Because Mr. Doolittle's use of a dangerous instrument was disputed at trial, this Court found that the jury instructions' omission "totally excused the State from its burden of proof as to a contested element of a crime." The Court found plain error and reversed the defendant's conviction. *Id.* at 30.

In this case, the record shows that Mr. Stover's knowledge of the content and character of the suitcase's contents was seriously disputed. There was no evidence that Mr. Stover had physical possession of the suitcase and its contents. Instead, the state's evidence related to whether Mr. Stover had constructive possession of the suitcase by showing that he had access to and control over the vehicle in which the PCP was found. Because Mr. Stover and Mr. Butler had joint control over the vehicle where the suitcase and drugs were discovered, the state had the burden of presenting additional evidence connecting Mr. Stover with the PCP in the suitcase and creating a reasonable inference that he had knowledge and control of the PCP.

The state presented the evidence discussed previously, such as evidence of his incriminating false statements and Mr. Stover's admission of ownership of the watch found in the trunk next to the suitcase, which the jury could find was the required additional evidence that Mr. Stover knew of the suitcase and the PCP. Nevertheless, Mr. Stover disputed the state's evidence. For example, there was testimony from Tom Gray, a certified tech-

nician for the Missouri State Highway Patrol that Mr. Stover told him he did not look into the trunk and did not know what was in the trunk. Corporal Hagerty also testified Mr. Stover said he did not know the suitcase was in the trunk and did not know what was in the suitcase. Corporal Hagerty acknowledged that neither the suitcase nor the trunk had a discernable odor that would alert Mr. Stover to the presence of a controlled substance, even if Mr. Stover had opened the trunk. Corporal Hagerty further testified when he placed Mr. Stover in the patrol car, he did not smell any odor on Mr. Stover that suggested to him that he had been around illegal drugs. *Cf., e.g., State v. Purlee* 839 S.W.2d 584, 588 (Mo. banc 1992) (finding strong odor of marijuana in van jointly possessed by defendant and passenger during a 12–hour drive supported defendant's knowledge of the presence of a controlled substance). Corporal Hagerty also testified that, at one point, Mr. Stover denied the watch was his, and Corporal Hagerty could not tell if the gift bag and watch had been placed in the trunk before or after the suitcase.

The record shows that whether Mr. Stover knew the content and substance of the liquid in the suitcase was seriously disputed. Because the verdict director deviated from MAI–CR3d 325.10.2, it did not require the jury to find that Mr. Stover knew the content or character of the drugs in the suitcase to find him guilty. The trial court's failure to so instruct the jury relieved the state of its burden of proving each element of the offense beyond a reasonable doubt. This failure was plain error and requires the reversal of Mr. Stover's conviction and sentence and remand of the case to the trial court. Mr. Stover's remaining claims of trial court error will be addressed because the issues are likely to arise on retrial.

**Pre–*Miranda* Statements are Admissible**

Mr. Stover contends that the trial court erred in failing to sustain his motion to suppress and in allowing into evidence the statements he made during the traffic stop before he received *Miranda* warnings. This Court reviews a trial court's ruling on a motion to suppress in the light most favorable to the ruling and defers to the trial court's determinations of credibility. *Schroeder,* 330 S.W.3d at 472. The inquiry is limited to a determination of whether the trial court's decision is supported by substantial evidence. *Id.*

A criminal suspect is entitled to *Miranda* warnings once the suspect is subjected to a custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Missouri defines "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody...." *State v. Gaw,* 285 S.W.3d 318, 321 (Mo. banc 2009) (citing *State v. Glass,* 136 S.W.3d 496, 511 (Mo. banc 2004)). Statements obtained during a custodial interrogation not preceded by *Miranda* warnings are subject to suppression at trial. *Id.*

The statements made by Mr. Stover during the traffic stop, however, did not occur during a custodial interrogation. In *Berkemer v. McCarty,* the United States Supreme Court definitively stated that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to [traffic stops] are not 'in custody' for the purposes of *Miranda.*" 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Accordingly, Mr. Stover's statements made during that time are not subject to suppression on the basis of *Miranda.*

## Evidence of Refusal to Consent to Search is Admissible

In another point on appeal, Mr. Stover contends that the trial court erred in admitting evidence and argument regarding his refusal to consent to a search of the vehicle, thereby inducing the jury to infer that he was guilty based on invocation of his Fourth Amendment right. The trial court overruled Mr. Stover's objections to allowing into evidence the testimony and the patrol car DVD showing his refusal to consent to a search and overruled his objection to the state playing the DVD during the closing argument. Mr. Stover contends that the evidence of his refusal to consent to a search was used to prove his guilt, in violation of his right to due process and a fair trial.

Mr. Stover contends that admitting evidence of his refusal to consent to a search is unconstitutional, akin to admitting evidence of a suspect remaining silent after receiving *Miranda* warnings. *See Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (use of defendant's silence at the time of arrest and after receiving *Miranda* warnings for purpose of impeachment violates due process clause). However, Mr. Stover fails to cite to a case holding that evidence of a suspect's refusal to consent to a search is constitutionally barred when used to explain subsequent actions as opposed to a suspect's guilt.[5] The holding in *Doyle* "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.' " *Wainwright v. Greenfield,* 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (citation omitted). The rationale of *Doyle* does not extend to prohibit admission of evidence of a suspect's refusal to consent to a search for a purpose other than proving guilt of the refusing party.

## Evidence of DEA Commendation Admissible

For his final point on appeal, Mr. Stover contends that the trial court abused its discretion in overruling his hearsay objection and allowing the testimony of Corporal Hagerty regarding the commendation he received from the DEA. After Corporal Hagerty discovered the PCP in Mr. Stover's possession, the DEA publicly recognized Corporal Hagerty for making the largest PCP seizure in the history of the United States up to 2003. Over Mr. Stover's objection, the trial court permitted Corporal Hagerty's testimony that he received a commendation for such a large seizure. The trial court's decision to admit or exclude evidence is reviewed for a clear abuse of discretion and will not

5. Some federal appellate courts have discussed the issue. *See United States v. Dozal,* 173 F.3d 787, 794, n. 2 (10th Cir.1999) (rejecting argument that state's comment at trial on defendant's refusal to consent violated constitutional rights); *United States v. Thame,* 846 F.2d 200, 207 (3rd Cir.1988) (improper for state to argue refusal of consent to search constituted *evidence of guilt); United States v. Prescott,* 581 F.2d 1343, 1350 (9th Cir.1978) (improper for state to argue refusal of consent to search constituted *evidence of guilt); United States v. Runyan,* 290 F.3d 223, 249–250 (5th Cir.2002) (if improper, harmless error under circumstances); *United States v. Moreno,* 233 F.3d 937, 941 (7th Cir.2000) (if improper, harmless error under circumstances). Regardless, the cases cited refer to the impropriety of using such evidence to prove *guilt.* Here, the state did not argue that Mr. Stover's refusal of consent to search constituted evidence of guilt; rather, the evidence explained the subsequent actions of Corporal Hagerty and Mr. Stover. Further, Mr. Stover expressly refused the trial court's offer to instruct the jury that it could not consider his refusal to consent to a search as evidence of his guilt.

be reversed absent prejudice. *Baumruk*, 280 S.W.3d at 607.

■ "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007). Corporal Hagerty's testimony regarding the DEA commendation was not introduced to prove that the seizure was in fact the largest PCP seizure in the United States until 2003. The testimony was introduced to demonstrate to the jury that the amount of PCP seized was a large amount, consistent with the intent to sell or distribute. Further, evidence of a large amount of a controlled substance is admissible as circumstantial evidence to prove knowing possession, as discussed in Mr. Stover's second point on appeal.

### Conclusion

The submission of a verdict director that did not require the jury to find that Mr. Stover knew the substance and character of the liquid in the suitcase was plain error. The judgment of the trial court is reversed, and the case is remanded.

TEITELMAN, C.J., RUSSELL, STITH and DRAPER, JJ., concur; FISCHER, J., dissents in separate opinion filed.

ZEL M. FISCHER, Judge.

I respectfully dissent from the principal opinion. The principal opinion holds that verdict-directing Instruction No. 6 constituted plain error because it did not contain a phrase that Melvin Stover knew of the content and character of the substance in his trunk. I would hold that, despite the omission in the verdict director, no miscarriage of justice or manifest injustice occurred. I would affirm the judgment of the circuit court.

### Standard of Review

Because Stover failed to make a specific objection at trial to the definition of "trafficking" contained in Instruction No. 6, this Court's review of the instruction is limited to plain error review. *State v. Wurtzberger*, 40 S.W.3d 893, 898 (Mo. banc 2001).

For instructional error to rise to the level of plain error, Stover must demonstrate that the circuit court "so misdirected or failed to instruct the jury that the error affected the jury's verdict." *State v. Dorsey*, 318 S.W.3d 648, 652 (Mo. banc 2010). The misdirection must cause manifest injustice or miscarriage of justice. *State v. Doolittle*, 896 S.W.2d 27, 29 (Mo. banc 1995). "Clear and obvious instructional error is rarely found to result in manifest injustice or a miscarriage of justice, requiring reversal for plain error." *State v. White*, 92 S.W.3d 183, 192 (Mo. App.2002).

If substantial grounds exist for believing that manifest injustice or miscarriage of justice resulted from the error, this Court may proceed to review the claim under a two-step process pursuant to rule 30.20. First, the court decides whether plain error has occurred. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). "All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear." *Id.* (citations and internal quotation marks omitted). Second, the Court must consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.*

### Analysis

This Court unanimously agrees that there was sufficient evidence to support the jury verdict that Stover knowingly possessed PCP for the purpose of committing

the offense of trafficking. The principal opinion holds that the omission of the phrase "knowing of the substance's content and character" from Instruction No. 6 constituted plain error, in that the omission was a serious miscarriage of justice. I do not agree.

I agree with the principal opinion that the omission in Instruction No. 6 was error. To be in compliance with MAI–CR 325.10.2, the definition of "trafficking" needed to include the phrase "knowing of the substance's content and character." It did not.

I disagree with the principal opinion that the mistake rises to the level of a miscarriage of justice as to warrant plain error relief. At trial, it was undisputed that the suitcases in the trunk of Stover's rental car contained ten gallons of liquid. It was undisputed that this liquid was tested in a laboratory, and it was undisputed that the substance was found to be PCP. Stover never disputed the "content and character" of the substance at trial. Rather, Stover disputed that he had any knowledge of the presence of the suitcase or the suitcase's contents.

Instruction No. 6 required the jury to find beyond a reasonable doubt that Stover knowingly possessed 90 grams or more of PCP and that the possession was a substantial step toward the commission of the offense of trafficking. The instructions required the jury to find beyond a reasonable doubt that either Stover or Butler possessed the PCP for the purpose of committing the offense of trafficking in the first degree. The instructions defined "purpose" as requiring that Stover had the conscious object to commit the offense of trafficking in the first degree. Moreover, the instructions defined "trafficking in the first degree" as "knowingly distributes, delivers or sells 90 grams or more" of PCP.

In my view, it is implausible to suggest that the jury would have found that Stover was unaware of the content and character of the PCP while simultaneously finding that he knowingly distributed, delivered, or sold 90 grams or more of the substance. As noted in the principal opinion, "Mr. Stover's knowing possession of the PCP reasonably may be inferred." Op. at 148. All the evidence cited by the principal opinion to support the notion that Stover contested the content and character of the substance—testimony that Stover did not know what was in the trunk, testimony that Stover did not look in the trunk, testimony that neither the suitcases nor Stover smelled like PCP—shows that Stover's true dispute concerned his knowledge of the presence of the suitcases or the liquid. This evidence is an attempt to show that Stover was unaware of the suitcase and, if the jury did not believe that proposition, that Stover did not know the suitcases contained 10 gallons of liquid. There was no assertion that Stover believed the substance to be something other than PCP.

### Conclusion

Under the facts of this case, the omission in Instruction No. 6 did not so misdirect the jury as to affect its verdict. Simply put, though error occurred, no miscarriage of justice or manifest injustice resulted. This Court should affirm the judgment.