

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI,                )
                                  )
    Plaintiff-Respondent,         )
                                  )
vs.                               )    No. SD37358
                                  )
JOSEPH P. SALSMAN,                )    **Filed:  March 15, 2024**
                                  )
    Defendant-Appellant.          )

APPEAL FROM THE CIRCUIT COURT OF LAWRENCE COUNTY

The Honorable David A. Cole, Judge

## **AFFIRMED**

Joseph P. Salsman appeals the trial court's judgment convicting him of the class B felony of driving while intoxicated ("DWI") under section 577.010 (Count I) and the class E felony of driving while license was revoked ("DWR") under section 302.321 (Count II) following a jury trial.[1]  Salsman raises five points on appeal alleging the trial court erred by:  (1) permitting a Missouri State Highway Patrol trooper to testify from his arrest report without a sufficient independent recollection of the facts at issue because the report was not used to refresh his recollection or as a past recollection recorded; (2) denying Salsman's motions to suppress and admitting into evidence incriminating statements he made to the trooper while in custody without

---

[1] All references to statutes are to RSMo Supp. 2017, unless otherwise indicated.

being given *Miranda*[2] warnings; (3) denying a judgment of acquittal as to DWI because the evidence was insufficient to prove each element of DWI beyond a reasonable doubt; (4) denying Salsman's motions for judgment of acquittal as to DWR because there was insufficient evidence he "knew or was aware" his license was revoked; and (5) admitting evidence of Salsman's prior conviction for DWR in 2015 because it was not logically or legally relevant. Finding no merit in Salsman's points, we affirm the trial court's judgment.

## Factual Background and Procedural History

On October 20, 2017, two men were traveling on a highway from Everton to Republic, Missouri. They had just driven over a hill when the passenger, Z.F., noticed a black truck stopped in the middle of the road. Z.F. identified Salsman as the driver of the black truck. As the vehicle with the two men in it approached the truck, Salsman started "a small burnout" and slammed the truck into reverse into the roadside ditch. The road had no shoulder, and the ditch was a drop of four to five feet. All four of the truck's tires became stuck in the ditch.

Z.F. got out of the vehicle and approached the truck on the passenger side. He smelled alcohol coming from the truck and saw Salsman "scrambling around in his truck." Salsman told Z.F. to call for a tow truck because he "didn't want any cops there[,]" but Z.F. called 911 anyway. Salsman became upset when he found out Z.F. was on the phone with a 911 dispatcher. Law enforcement arrived 10 to 15 minutes later.

Jon Ford, a lieutenant with the Lawrence County Sheriff's Office, had Salsman sit in front of a patrol car so he would not "fall down in the ditch and get hurt or stumble out into" the road while Lieutenant Ford directed traffic. According to Lieutenant Ford, he did not handcuff Salsman because he "didn't have any reason to hold [Salsman] there." A Missouri State

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

Highway Patrol trooper who arrived later, Robert Creasey, asked Salsman how his truck got in the ditch. Salsman responded, "I got drunk and wrecked my truck." Trooper Creasey noticed Salsman's eyes were bloodshot and watery, and Salsman's speech was slurred. After Trooper Creasey asked Salsman whether he had been drinking, Salsman said he had "five or six beers." Trooper Creasey could also smell alcohol on Salsman's breath when he spoke, and, when Trooper Creasey had Salsman stand, Salsman "had trouble keeping his balance and kind of swayed when he tried to move." Trooper Creasey determined Salsman was intoxicated but believed Salsman could hurt himself if he attempted field sobriety tests. After three to five minutes of questioning, Trooper Creasey placed Salsman under arrest for DWI and transported him to the Lawrence County Sheriff's Office.

The State charged Salsman with DWI as a habitual offender (Count I) and DWR with at least two prior DWR convictions (Count II). It charged Salsman as a prior and persistent offender. Salsman's case proceeded to a jury trial on October 25, 2021, and the jury found him guilty on both counts. This timely appeal followed. Additional facts will be included below as we address Salsman's points on appeal.

## Analysis

### Point I – A Witness May Testify from His Own Recollection.

In his first point, Salsman claims the trial court erred when it permitted Trooper Creasey to testify at trial because "he was unable to testify about facts at issue independent of the [arrest] report even after he looked at it and the State did not lay a foundation for the report as a past recollection recorded." This argument mischaracterizes the trial record.

<u>Additional Facts Pertinent to Point I</u>

Before trial, Salsman filed a motion in limine and motion to suppress physical evidence and a separate motion to suppress statements on November 18, 2020.  Both motions argued, *inter alia*, the trial court should suppress any incriminating statements Salsman made to law enforcement before he was read his *Miranda* warnings and Missouri's Implied Consent Law[3] along with "all evidence obtained as a result of and leading from those statements."  The trial court held a pre-trial hearing on those motions on April 8, 2021.

Lieutenant Ford testified at the pre-trial hearing that he responded to Salsman's motor vehicle accident near Route O near County Road 2090 in Lawrence County, and, when he arrived, there was a vehicle in the ditch.  He further testified he had Salsman sit in front of the patrol vehicle so Salsman would not be in harm's way in the road.  Once Highway Patrol arrived, he turned the investigation over to them.  Lieutenant Ford conducted traffic for about an hour while Highway Patrol investigated.  According to Lieutenant Ford, he did not believe he handcuffed Salsman, and he "would not have read *Miranda* because it was not [his] investigation."

Trooper Creasey testified at the pre-trial hearing that he also responded to the accident on October 20, 2017.  When he arrived, Trooper Creasey saw a black truck in the ditch, a person sitting in front of Lieutenant Ford's car, and a pipe that appeared to have residue laying on the truck seat.  Trooper Creasey testified he talked to Z.F. on scene as well.  Z.F. believed Salsman was intoxicated, and he observed Salsman throwing beer bottles from the vehicle.  Trooper Creasey further testified that Salsman stated, "I got drunk and wrecked my truck" at the accident

---

[3] *See* section 577.020.

4

scene. Trooper Creasey also remembered asking Salsman how much he had to drink and Salsman responding, "I believe five to six beers."

However, Trooper Creasey testified he did not remember whether Salsman was handcuffed before he placed Salsman under arrest. The State asked Trooper Creasey if reviewing his arrest report would refresh his recollection, and Trooper Creasey reviewed his report to recall Salsman was not handcuffed before Trooper Creasey arrested him. Salsman did not object to Trooper Creasey referring to his arrest report. Trooper Creasey also reviewed his arrest report to recall when he read Missouri's Implied Consent Law to Salsman, when he advised Salsman of his *Miranda* rights, and that Salsman's specific answer to whether he had been drinking was, "Evening and morning." Under cross-examination from the defense, Trooper Creasey admitted he did not have "an independent recollection" of reading Salsman the Implied Consent Law, reading the *Miranda* warning, Salsman's "speech[,]" or Salsman's breath without referring to his arrest report.

Salsman filed an additional motion in limine on October 22, 2021, after the trial court's hearing on the previously filed motions to suppress. This third motion renewed Salsman's requests in the previous motions to suppress and specifically sought to exclude Trooper Creasey's testimony at trial because he allegedly "had no independent recollection of" the facts at issue during an earlier deposition and the April 8, 2021, pre-trial hearing. The trial court denied Salsman's motion in limine at trial, and Trooper Creasey was permitted to testify.

Trooper Creasey testified at trial on direct examination without referring to any writings to refresh his recollection. Once the State asked Trooper Creasey, "did you prepare any documents regarding license status for the department of revenue[,]" the defense objected and argued Trooper Creasey should not be able to testify further "because he has testified previously

5

that he does not have an independent recollection of anything on this case other than seeing [Salsman] sway in the ditch and the statement that he allegedly made at the scene." The trial court overruled the objection, and Trooper Creasey continued testifying from memory.

During cross-examination, the defense attempted to impeach Trooper Creasey by comparing his testimony at trial, given from memory, to his earlier testimony at his deposition and the pre-trial hearing where he did not independently remember some parts of the incident and his interactions with Salsman without referring to his arrest report. The defense asked Trooper Creasey, "How did you get your memory back some four years later when you didn't the two other times I've talked to you about this?" Trooper Creasey explained he now remembered arresting Salsman and the surrounding circumstances after "reviewing [his] reports" before trial.

<u>Standard of Review</u>

The decision to admit or exclude evidence is reviewed for an abuse of discretion and will not be reversed absent prejudice. ***State v. Stover***, 388 S.W.3d 138, 156-57 (Mo. banc 2012); ***State v. Shaddox***, 598 S.W.3d 691, 694 (Mo. App. S.D. 2020). An abuse of discretion requires a ruling to be against the logic of the circumstances and so unreasonable as to show a lack of careful consideration. ***State v. Beerbower***, 619 S.W.3d 117, 123 (Mo. App. S.D. 2020). Prejudice, for purposes of our review, means "the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." ***State v. Morgan***, 674 S.W.3d 497, 502 (Mo. App. W.D. 2023) (quoting ***State v. Bowman***, 663 S.W.3d 916, 923 (Mo. App. W.D. 2023)).

6

## The Trial Court did not Abuse its Discretion by Allowing Trooper Creasey to Testify

Salsman argues the trial court should not have permitted Trooper Creasey to testify to facts contained in his arrest report because he was "consistent that even after reading his report, he only had a recollection of four things from out on the road" and could not testify about any other facts.[4]  However, contrary to Salsman's claim, Trooper Creasey's testimony at trial was based on his own memory after reviewing his arrest reports in preparation for trial.[5]  "When a witness uses a document to refresh recollection *before* testifying, the testimony is based on personal recollection 'not then aided and assisted by . . . notes in hand.'"  *State ex rel. Polytech, Inc. v. Voorhees*, 895 S.W.2d 13, 15 (Mo. banc 1995) (quoting *State v. Miller*, 368 S.W.2d 353, 357 (Mo. 1963)); *see also State v. Couch*, 567 S.W.2d 360, 362 (Mo. App. St.L.D. 1978)

---

[4] Salsman concedes Trooper Creasey remembered Salsman sitting in front of the police vehicle, Salsman saying, "I got drunk and wrecked my truck[,]" Salsman's swaying movements, and a marijuana pipe found in Salsman's truck.

[5] We note Trooper Creasey referred to the Alcohol Influence Report ("AIR") in two limited instances:  1) when the State asked him to recite Missouri's Implied Consent Law from the AIR for the jury; and 2) when he testified he read the Implied Consent Law to Salsman at 6:41 p.m.  In the first instance, and upon the State's request, Trooper Creasey read Missouri's Implied Consent Law "directly off the form" just as he read it to Salsman after arrest.  This *verbatim* reading replicated Salsman's booking and was not an example of a witness using a document to refresh his or her recollection.  In the second instance, the State asked Trooper Creasey when he read the Implied Consent Law to Salsman, and Trooper Creasey replied, without objection from the defense, "It is document [sic] as 18:41 which would be 6:41."  To the extent Trooper Creasey may have read from the AIR to give the "6:41" answer without being previously asked whether he could recall the specific time, the defense did not object, and, even if a prior objection would suffice, we conclude there is not a reasonable probability this information alone changed the outcome of the trial given the totality of other evidence.  *See State v. Johnson*, 687 S.W.2d 706, 709 (Mo. App. W.D. 1985) ("[E]rror without prejudice, if there was here error, affords no basis for relief by an appellate court.") (citation omitted).

7

(finding no abuse of discretion in allowing a witness to testify after the State refreshed her memory during a recess at trial).

Because Trooper Creasey refreshed his memory before trial, his "independent recollection, and not the writing, [was] the evidence allowed before the jury." ***State v. Payne***, 126 S.W.3d 431, 442 (Mo. App. S.D. 2004). Trooper Creasey's earlier statements during his deposition and the pre-trial hearing - that he had no memory of certain facts - do not change our analysis because any conflicts between his testimony before and at trial were for the jury to resolve. ***State v. Lane***, 415 S.W.3d 740, 751 (Mo. App. S.D. 2013) ("Inconsistencies and conflicts in testimony go to the credibility of the witness, not the admissibility of the testimony, and are left to the jury to resolve."). Any lapse in memory before trial related only to Trooper Creasey's credibility and did not foreclose him from testifying to what he later claimed to remember. *See **State v. Mahaffey***, 676 S.W.2d 20, 22 (Mo. App. S.D. 1984) (determining no abuse of discretion in permitting a witness to testify at trial despite not remembering certain facts at an earlier deposition); *see also **State v. Williamson***, 595 S.W.2d 4, 7 (Mo. App. E.D. 1979) (holding no abuse of discretion in permitting a detective to testify on events two years before trial though his "memory was not jogged to perfection"). The trial court did not abuse its discretion in permitting Trooper Creasey to testify at trial despite any prior inability to recall certain facts surrounding Salsman's arrest. Point I is denied.

**Point II – The Trial Court did not Err by Permitting Trooper Creasey to Testify to Statements Salsman Made Before Being Issued a *Miranda* Warning.**

Salsman argues in Point II that the trial court should have suppressed the incriminating statements he made to Trooper Creasey before being issued a *Miranda* warning. This point fails because Salsman was not subject to a custodial interrogation for purposes of *Miranda*.

8

<u>Additional Facts Pertinent to Point II</u>

As previously described, Lieutenant Ford had Salsman sit in front of a patrol car upon arriving at the traffic accident so Salsman would not "fall down in the ditch and get hurt or stumble out into" the road. Trooper Creasey asked Salsman how his truck got in the ditch, and Salsman replied, "I got drunk and wrecked my truck." He then asked Salsman if he had been drinking, and Salsman said, "yes" and that he had "five or six beers." Trooper Creasey arrested Salsman and took him to the Sheriff's Office after seeing Salsman struggle to keep his balance and "kind of sway[] when he tried to move" and after smelling alcohol on Salsman's breath. At the Sheriff's Office and at 6:41 p.m., Trooper Creasey read Salsman Missouri's Implied Consent Law directly from the AIR on Trooper Creasey's computer. The AIR explained Salsman's driver's license would be revoked if he refused to take a blood-alcohol test. Salsman refused a breathalyzer test at that time.

Trooper Creasey read Salsman his *Miranda* rights at approximately 6:42 p.m. and then asked additional questions. When Trooper Creasey asked Salsman what time and date it was, he responded, "12:02" and "2022[,]" respectively. When Trooper Creasey asked Salsman what day of the week it was, Salsman responded, "I need a rubber room." When Trooper Creasey asked Salsman what city he was in, Salsman responded, "Congress." Salsman told Trooper Creasey he had been drinking since "[t]welve o'clock" and finished drinking at "[t]welve o'clock[,]" and, when Trooper Creasey asked Salsman how much he had to drink, Salsman said "twelve o'clock" again. Salsman also stated he smoked "[a] lot" of marijuana two hours prior, he had been drinking, and he was under the influence of an alcoholic beverage during his conversation with Trooper Creasey. When Trooper Creasey asked whether Salsman had been operating a vehicle,

Salsman responded, "yes and no." When asked what he was drinking, Salsman replied, "evening and morning[.]"

Salsman's motions to suppress, filed before trial, sought a trial court order suppressing any incriminating statements Salsman made to law enforcement before he was read his *Miranda* warnings, including "all evidence obtained as a result of and leading from those statements." The trial court denied these motions after receiving Lieutenant Ford's and Trooper Creasey's testimony at the April 8, 2021, pre-trial suppression hearing. Salsman renewed his motions in a separate motion in limine, which the trial court again denied at trial.

Standard of Review

This Court "will reverse a trial court's ruling on a motion to suppress only if it is clearly erroneous." **State v. Creutz**, 657 S.W.3d 303, 310 (Mo. App. S.D. 2022) (quoting **State v. Holman**, 502 S.W.3d 621, 624 (Mo. banc 2016)). Clear error requires us to be "left with a definite and firm belief a mistake has been made." **Holman**, 502 S.W.3d at 624 (quoting **State v. Bell**, 488 S.W.3d 228, 238 (Mo. App. E.D. 2016)). We evaluate a trial court's ruling on a motion to suppress to determine whether there is substantial evidence to support the decision. **State v. Schroeder**, 330 S.W.3d 468, 472 (Mo. banc 2011); **State v. Vandervort**, 663 S.W.3d 520, 524 (Mo. App. W.D. 2023). All facts are viewed in the light most favorable to the judgment, and we disregard all contrary facts and inferences. **State v. Bales**, 630 S.W.3d 754, 758-59 (Mo. banc 2021). "The question of whether a criminal defendant's constitutional rights were violated is a question of law reviewed *de novo*." **State v. Gates**, 635 S.W.3d 854, 857 (Mo. banc 2021).

<u>Salsman was not Subject to a Custodial Interrogation When He Made Statements Before</u>
<u>Receiving a *Miranda* Warning</u>

Salsman argues in Point II that the trial court clearly erred by denying his "motions to suppress and admitting into evidence at trial the incriminating statements he made to Trooper Creasey" because he made those statements during a custodial interrogation without the benefit of *Miranda* warnings.[6] Arresting officers must warn criminal defendants of their right to remain silent to protect themselves against self-incrimination once they are subject to a custodial investigation. *Miranda*, 384 U.S. at 444; *Holman*, 502 S.W.3d at 624-25. "A custodial interrogation . . . occurs only when the suspect is formally arrested or is subjected to arrest-like restraints." *Holman*, 502 S.W.3d at 625 (quoting *State v. Lammers*, 479 S.W.3d 624, 631-32 (Mo. banc 2016)). There are no exhaustive factors for determining custody, and courts ultimately consider custody by the totality of circumstances. *State v. Bruce*, 503 S.W.3d 354, 358 (Mo. App. S.D. 2016). Should law enforcement fail to issue *Miranda* warnings, any incriminating statements made during a custodial interrogation are inadmissible. *Holman*, 502 S.W.3d at 625; *State v. Steele*, 454 S.W.3d 400, 404 (Mo. App. E.D. 2015).

---

[6] We note "a point relied on attacking the trial court's ruling on a pre[-]trial motion to suppress, without attacking the court's ruling admitting the evidence, is deficient in that it does not identify the actual ruling that is subject to challenge and, therefore, does not preserve the issue for appellate review." *State v. Long*, 599 S.W.3d 908, 915 n.2 (Mo. App. S.D. 2020) (quoting *State v. Wolf*, 91 S.W.3d 636, 642 (Mo. App. W.D. 2002)). If a trial court denies a pre-trial motion to suppress, the defendant must renew his or her motion at trial by making a trial objection to the admission of the challenged evidence. *State v. Derennaux*, 535 S.W.3d 395, 399 (Mo. App. S.D. 2017). We consider Salsman's Point II to be preserved because he raised a motion in limine before trial, he renewed his motion again at trial, and the trial court permitted Salsman to make a continuing objection to the admission of evidence subject to the motion in limine.

Salsman contends he was subject to a custodial interrogation once Lieutenant Ford told him to sit in front of the patrol car and when Trooper Creasey began questioning him. Given the circumstances of the accident and following arrest, a *Miranda* warning was not required when Lieutenant Ford told him to sit or when Trooper Creasey began asking preliminary questions. *See* **State v. Proctor**, 681 S.W.3d 709, 713 (Mo. App. S.D. 2023) ("In Missouri, 'custodial interrogation' is defined as questioning initiated by law enforcement officers after a person has been taken into custody[.]") (quoting **State v. Gaw**, 285 S.W.3d 318, 321 (Mo. banc 2009)). Law enforcement may approach vehicles for safety reasons or if a motorist needs assistance. **Schroeder**, 330 S.W.3d at 473. Roadside questioning of a suspect is like a "*Terry* stop"[7] such that temporarily detained motorists are not in custody for purposes of *Miranda*. **State v. Harper**, 517 S.W.3d 1, 3 (Mo App. S.D. 2017) (quoting **State v. Tally**, 153 S.W.3d 888, 896 (Mo. App. S.D. 2005)). Such limited questioning may include requesting a driver's license, asking someone to sit in a patrol car, and inquiring into a driver's sobriety to confirm reasonable suspicions. **Schroeder**, 330 S.W.3d at 473-74; **State v. Keeth**, 203 S.W.3d 718, 725-26 (Mo. App. S.D. 2006). Officers can even prolong a roadside detention without the need for *Miranda* warnings where "the circumstances support[] an objective reasonable suspicion that criminal activity [is] occurring." **Stover**, 388 S.W.3d at 150.

All of these considerations support the conclusion Salsman's roadside detention was a "reasonable investigation" and not a custodial investigation. **Schroeder**, 330 S.W.3d at 473. Lieutenant Ford did not handcuff Salsman upon arrival. Though Lieutenant Ford directed Salsman to sit in front of the patrol car, Lieutenant Ford did so out of a concern for Salsman's safety. Salsman had just been in an apparent traffic accident with his vehicle stuck in a ditch,

---

[7] **Terry v. Ohio**, 392 U.S. 1 (1968).

12

there was no shoulder, and the road's edge dropped four to five feet into the ditch. Trooper Creasey likewise had valid grounds to briefly ask about Salsman's wellbeing, including how the accident occurred. Salsman's response of, "I got drunk and wrecked my truck[,]" to Trooper Creasey's questioning then provided the reasonable suspicion necessary to inquire further. The trial court did not clearly err by denying Salsman's motions to suppress and admitting the incriminating statements Salsman made at the scene of the accident into evidence.

Salsman also argues the trial court should have, at a "minimum[,]" suppressed his refusal to take a blood-alcohol test because Trooper Creasey read Missouri's Implied Consent Law and asked Salsman to submit to testing before the *Miranda* warning and after being arrested, being handcuffed, and being taken to the Sheriff's Office. Missouri courts have repeatedly rejected similar arguments. *See*, *e.g.*, **Spradling v. Deimeke**, 528 S.W.2d 759, 764 (Mo. 1975); *see also* **Proctor**, 681 S.W.3d at 714; **Vandervort**, 663 S.W.3d at 526.

**Vandervort** held a suspect's refusal to submit to blood-alcohol testing was admissible in a criminal trial despite the suspect saying "no" while in custody and before a law enforcement officer provided a *Miranda* warning. **Id.** at 526. Though the suspect, like Salsman, was in custody before being read Missouri's Implied Consent Law and asked to undergo sobriety testing, "a refusal to submit to a blood-alcohol test in Missouri is not an act coerced by law enforcement and, therefore, is not protected by the privilege against self-incrimination" such that a *Miranda* warning was required. **Id.** at 525. This Court similarly held police officers are not required to provide *Miranda* warnings before asking whether a suspect will take a blood-alcohol test because the inquiry under Missouri's Implied Consent Law "is not an interrogation within the meaning of *Miranda*[.]" **Proctor**, 681 S.W.3d at 714 (quoting **South Dakota v. Neville**, 459 U.S. 553, 564 n.15 (1983)). Rather, Missouri's Implied Consent Law imposes a civil penalty of

13

losing one's license should a driver choose to not submit to testing for alcohol consumption. ***Wood v. Dir. of Rev.***, 668 S.W.3d 292, 297 (Mo. App. S.D. 2023). There is no compelled response, and a suspect can always refuse a test. ***Proctor***, 681 S.W.3d at 714.

Salsman's refusal to undergo blood-alcohol testing was not a compelled response from law enforcement, and Trooper Creasey did not need to give Salsman a *Miranda* warning before asking him to test. ***Vandervort***, 663 S.W.3d at 526 ("[G]iven the independent purposes and requirements of *Miranda* and the implied consent law, there is no particular order in which the warnings must be provided when drivers are arrested for an alcohol-related offense."). The trial court did not clearly err by admitting Salsman's refusal to submit to blood-alcohol testing into evidence. *See* ***State v. Farmer***, 548 S.W.2d 202, 206 (Mo. App. Spfld.D. 1977) ("Defendant's complaint that he was given no Miranda warning preceding his breathalyzer test is governed by [***Spradling***, 528 S.W.2d at 764]."). Point II is denied.

### Point III – There was Sufficient Evidence to Prove Salsman Drove While Intoxicated Beyond a Reasonable Doubt.

Salsman argues in Point III that the trial court erred by "denying a judgment of acquittal as to Count I [DWI] because the State failed to introduce sufficient evidence to prove each element of [DWI]" in that the State failed to present evidence Salsman was intoxicated at the time he was driving. Because we denied Points I and II, this argument fails.

Standard of Review

A review for the sufficiency of the evidence evaluates whether there was enough evidence to permit a reasonable juror to find the defendant guilty of the charged offense beyond a reasonable doubt. ***State v. Hollowell***, 643 S.W.3d 329, 341 (Mo. banc 2022).

> This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in

14

light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt.

*State v. Hilleman*, 634 S.W.3d 709, 712 (Mo. App. S.D. 2021) (quoting *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011)).  We do not reweigh the evidence on appeal and accept as true all evidence tending to prove guilt.  *State v. Naylor*, 510 S.W.3d 855, 858-59 (Mo. banc 2017).

There was Sufficient Evidence to Prove Salsman Committed the Offense of DWI

"A person commits the offense of [DWI] if he or she operates a vehicle while in an intoxicated condition."  Section 577.010.1.  "Intoxicated" refers to being "under the influence of alcohol, a controlled substance, or drug, or any combination thereof[.]"  Section 577.001(13).  Salsman challenges the sufficiency of the evidence to support his conviction for this offense under Point III, but his briefing relies exclusively on his arguments asserted in Point II.  According to Salsman, there would have been insufficient evidence regarding when Salsman started drinking or how much he had to drink had the trial court excluded the statements Salsman made to Trooper Creasey before being given the *Miranda* warning.  Salsman does not, however, directly explain why the evidence, once admitted, was insufficient to support his conviction for DWI but, instead, directs this Court to review his argument under Point II.  This use of incorporation by reference is not sufficient for the argument section of a brief.  *In re Marriage of Blanchard*, 613 S.W.3d 879, 887-88 n.10 (Mo. App. S.D. 2020).  Not providing a separate argument for each individual point relied on warrants denial of the point.  *Sugar Ridge Properties v. Merrell*, 489 S.W.3d 860, 873 n.8 (Mo. App. S.D. 2016).

Salsman's failure to brief an argument without using incorporation by reference notwithstanding, he acknowledges the alleged "improper evidence" at issue in Point II, if admissible, is sufficient to support his conviction.  Because we found no evidentiary error in the

15

admission of Trooper Creasey's testimony or Salsman's statements made to Trooper Creasey before and after *Miranda*, there was sufficient evidence for a reasonable jury to find Salsman guilty of DWI.[8]  Point III is denied.

**Points IV and V – There was Sufficient Evidence to Prove Salsman Knew His License was Revoked, and Evidence of His 2015 Conviction for DWR was Admissible to Prove Knowledge.**

Salsman argues under Point IV that the trial court erred by denying a judgment of acquittal as to the offense of DWR because the State failed to introduce sufficient evidence he knew his driver's license was revoked.  In his final point, Point V, Salsman claims the trial court erred by admitting evidence of his 2015 conviction for DWR because that conviction was not logically or legally relevant.  We deny both points.

Additional Facts Pertinent to Points IV and V

Three days before trial, the State filed a Motion for Prior Bad Acts to admit portions of Salsman's driving history as it related to his knowledge that his license was revoked.  The State's motion specified it had asked the defense to stipulate Salsman knew he had a revoked license when he drove the truck.  If Salsman would not agree to that stipulation, the State asked the trial court for the ability to introduce evidence Salsman's license "had a revoked status since 1997 and that he had a stop for [DWR] on June 4th 2015[.]"  At the beginning of trial, the parties met to address the State's motion before the trial court and outside the presence of the jury.  The

---

[8] We also note Salsman does not contest the admissibility of Z.F.'s testimony.  Circumstantial evidence alone is sufficient to support a criminal conviction.  **Hilleman**, 634 S.W.3d at 713.  Z.F. saw Salsman stopped on a highway and proceed into "a small burnout" into the ditch.  He smelled alcohol coming from Salsman's truck, and Salsman did not want law enforcement to get involved.  A reasonable jury could infer from these circumstances that Salsman drove while intoxicated.  *See State v. Delaney*, 675 S.W.2d 105, 106 (Mo. App. S.D. 1984) (finding sufficient evidence to support a conviction for DWI even though no witness identified the defendant as the driver).

16

defense argued Salsman's prior DWR conviction only showed a conviction "exists" but not that Salsman knew his license was revoked at the time of this charged offense. Nonetheless, the defense said it was "willing to stipulate . . . that [Salsman's] license was revoked."

The trial court ruled the State could present evidence of Salsman's driving record but ordered it done in the "least prejudicial way" possible. It asked the defense to clarify its willingness to stipulate as follows:

> [Defense]: I'll stipulate that [Salsman] was revoked in 1997; is that right?
> [Court]: '97. This motion [from the State] says '97.
> [Defense]: Yeah, I'll stipulate that he was revoked at that time.
> [Court]: That he has been revoked since '97?
> [Defense]: Yeah.

The State still sought to introduce evidence of Salsman's 2015 conviction for DWR because it "prove[d] that [Salsman] had knowledge[.]" The defense reiterated it would not stipulate to Salsman's knowledge but would stipulate to the 2015 conviction as follows:

> [Defense]: Okay. I want the record just for later in case I need to be clear that I am willing to stipulate as to the existence of that conviction. I am not willing to stipulate as to [Salsman's] knowledge that his license was revoked on the day in question.
>
> . . . .
>
> [Court]: Okay. So, we are going to stipulate that [Salsman] was convicted of [sic] June 4th, 2015, in the Greene County Circuit Court Springfield of driving while revoked.
> [Defense]: Yes. I do have a problem with one of [the State's] convictions, but that one is okay.
> [State]: And also, that he has not - has been revoked since 1997.
> [Defense]: Yes.

The parties agreed to a stipulation and to have the trial court read the stipulation to the jury. The trial court stated:

> I'm going to tell the jury that there has been a stipulation entered into by the parties because in the instruction we talk about the parties may enter into stipulations. Okay. The parties stipulate that [Salsman's] driver's license has been

17

revoked since 1997, and that [Salsman] was convicted for [DWR] on June 4th, 2015, in the Circuit Court of Greene County.

At that point, the defense stated that stipulation would be "over [its] objection" and continued:

[Defense]:   Okay. We are calling it a stipulation but just for the record that is over my objection. I do agree to stipulate as to [Salsman's] driver's license being revoked since that date without objection. The conviction I am objecting to for the record.

[Court]:     I understand. But what we are doing is [sic] we are doing it this way as the least offense [sic] way to you. Is that the way to put it?

[Defense]:   Yes, I understand. Thank you, Judge.

The trial court later read the following to the jury before Trooper Creasey testified:

The parties stipulate that the defendant's driver's license has been revoked since 1997, and the defendant was convicted for [DWR] on June 4th, 2015, in the Circuit Court of Greene County.

Standard of Review for Point IV

We will reverse the trial court's judgment only where there was insufficient evidence to find the defendant guilty of the charged offense beyond a reasonable doubt, and we accept as true all evidence tending to prove guilt together with all reasonable inferences which support the verdict. **Hollowell**, 643 S.W.3d at 341; **Naylor**, 510 S.W.3d at 858-59. Any evidence and inferences contrary to the verdict are disregarded. **Hollowell**, 643 S.W.3d at 341. "Circumstantial rather than direct evidence of a fact is sufficient to support a verdict." **State v. Jackson**, 681 S.W.3d 248, 258 (Mo. App. S.D. 2023) (quoting **Hilleman**, 634 S.W.3d at 713). "If circumstantial evidence supports equally valid inferences, it is up to the fact-finder to determine which inference to believe." **Id.** (quoting **Hilleman**, 634 S.W.3d at 713). However, and though we may rely on circumstantial evidence, "courts will not supply missing evidence or give the [S]tate the benefit of unreasonable, speculative or forced inferences." **State v. Langdon**, 110 S.W.3d 807, 811-12 (Mo banc 2003). We ask "only whether there was sufficient evidence from which the trier of fact reasonably could have found the defendant guilty." **State v. Welch**,

18

603 S.W.3d 745, 747 (Mo. App. S.D. 2020) (quoting ***State v. Claycomb***, 470 S.W.3d 358, 362 (Mo. banc 2015)).

<u>There was Sufficient Evidence Salsman Knew or Should Have Known His License was Revoked</u>

Salsman's Point IV reads, the trial court erred in denying his motions for judgment of acquittal as to Count II, DWR, "because there was insufficient evidence that he 'knew or was aware' his license was revoked in 2017 in that the only evidence at trial was a 'stipulation' that contained insufficient facts to impute to [Salsman] knowledge that his license was revoked."[9]

A person commits the offense of DWR by "operat[ing] a motor vehicle on a highway when such person's license or driving privilege has been cancelled, suspended, or revoked . . . and acts with criminal negligence with respect to knowledge of the fact that such person's driving privilege has been cancelled, suspended, or revoked." Section 302.321.1. Accordingly, to convict Salsman of DWR, the State had to prove beyond a reasonable doubt he: 1) operated a motor vehicle on a public road; 2) while his driving privileges had been cancelled, suspended, or revoked; and 3) Salsman acted with "criminal negligence" regarding knowledge of his driving

---

[9] Salsman's restatement of Point IV preceding the applicable portion of the argument section of his brief does not match the language used in Point IV as written in the points-relied-on section. Rule 84.04(e) provides the restatement of a point relied on at the beginning of its applicable portion of the argument section "*shall* be limited to those errors included" in the points-relied-on section, and Rule 30.06 applies Rule 84.04's drafting requirements to briefs filed in criminal appeals. (Emphasis added). Changing the point relied on in the argument section of a brief violates Rule 84.04(e), and any errors raised in a brief's argument that are not stated in the point-relied-on section are not preserved for review. ***Hale v. Burlington N. & Santa Fe Ry. Co.***, 638 S.W.3d 49, 61 (Mo. App. S.D. 2021). We nonetheless review Salsman's Point IV *ex gratia* because the restatement of Point IV before his argument section does not raise any different claims of error from the point-relied-on section. Both points raise a sufficiency-of-the-evidence challenge as to Salsman's DWR conviction, and both points follow the required Rule 84.04(d) format. All rule references are to Missouri Court Rules (2023), unless otherwise indicated.

19

privileges being cancelled, suspended, or revoked. *Id.* Criminal negligence is "fail[ing] to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation" from a reasonable person's standard of care. Section 562.016.5.

Salsman claims the State assumed a higher burden of proof to prove his actual knowledge, as opposed to criminal negligence, by using "knew or was aware" language in the charging information and jury instructions. We rejected this same argument in *State v. Collins*. 413 S.W.3d 689, 700 (Mo App. S.D. 2013) ("[The defendant's] driving record alone is substantial evidence to support the trial court's finding."). In *Collins*, the defendant insisted the State assumed a "higher burden" and needed to prove knowledge because the information alleged he "'knew'" his license was revoked. *Id.* This Court affirmed the conviction, determining section 302.321 only requires a "culpable mental state of 'criminal negligence[.]'" *Id.* Other courts have since approvingly cited to *Collins* for the proposition that a fact-finder may infer a driver's knowledge, or criminal negligence with respect to knowledge, from a driving record showing revocations or expirations alone. *See State v. Stufflebean*, 516 S.W.3d 456, 458-59 (Mo. App. E.D. 2017) ("We agree that in many circumstances a certified driving record is sufficient" to prove knowledge or criminal negligence.); *see also State v. Ise*, 460 S.W.3d 448, 456-57 (Mo. App. W.D. 2015) (holding a revocation letter sent to the defendant and a driving record were sufficient to show the defendant knew of the revocation); *State v. Shoemaker*, 448 S.W.3d 853, 859-60 (Mo. App. W.D. 2014) ("Proof of criminal negligence as it pertains to a defendant's knowledge that his driver's license was revoked may be based upon a review of his or her driving record."). Salsman attempts to distinguish *Collins* by noting it addressed an appeal from a bench trial, whereas his case was tried before a jury. This difference

20

is immaterial given that, "[w]hen reviewing the sufficiency of the evidence, the standard of review on appeal from a bench-tried case is the same as the standard used on appeal of a case tried to a jury." *State v. Laughlin*, 678 S.W.3d 520, 523 (Mo. App. E.D. 2023) (quoting *State v. Summers*, 653 S.W.3d 155, 166 (Mo. App. W.D. 2022)).

Here, the State presented evidence Salsman was recently convicted for DWR, and his driver's license had been revoked "*since 1997*," twenty years prior with no renewal. (Emphasis added). The jury was free to infer Salsman had an "unreasonable ignorance" of his license revocation, given the amount of time between his license revocation and the accident, and from that inference determine Salsman drove with criminal negligence by continuing to drive while his license was revoked. *Stufflebean*, 516 S.W.3d at 459; *see also Haynes v. State*, 600 S.W.3d 859, 866 (Mo. App. W.D. 2020) ("Evidence that a license has been suspended, and not reinstated by the date of arrest, is sufficient to prove the requisite culpable mental state for driving while revoked."). The evidence was therefore sufficient for the jury to determine Salsman violated section 302.321. Point IV is denied.

Standard of Review for Point V

A challenge to a trial court's admission of evidence is reviewed for an abuse of discretion. *Stover*, 388 S.W.3d at 156; *Shaddox*, 598 S.W.3d at 694. We look for prejudice and not mere error. *Shaddox*, 598 S.W.3d at 694. An appellant challenging the admission of evidence must show an error so great that there is a "reasonable probability" the jury would have reached a different conclusion without the error. *Morgan*, 674 S.W.3d at 502 (quoting *Bowman*, 663 S.W.3d at 923).

The Trial Court did not Abuse its Discretion by Admitting Salsman's 2015 Conviction for DWR

Salsman claims in Point V that the trial court erred by admitting evidence of his 2015 conviction for DWR because it "was not logically and legally relevant to proving the offense of [DWR] in 2017 in that the nature of the conviction did not impute knowledge to [Salsman] that his license was revoked in 2017[,]" and the 2015 DWR conviction was overly prejudicial.

Evidence must be both logically and legally relevant to be admissible. *State v. Schachtner*, 611 S.W.3d 885, 890 (Mo. App. S.D. 2020). Evidence is logically relevant if it "tends to make the existence of any fact that is of consequence" more or less likely or if it corroborates other relevant evidence. *Id.* (quoting *State v. Tisius*, 92 S.W.3d 751, 760 (Mo. banc 2002)). Salsman's 2015 conviction for DWR was clearly logically relevant here because the existence of the conviction makes it more likely Salsman knew or should have known his license was revoked when he drove in 2017. Whether Salsman knew or should have known he lacked a valid license when he drove the truck was related to the instant offense of DWR, and a fact-finder could infer knowledge from his 2015 DWR conviction. *See Johnson*, 687 S.W.2d at 710 (holding the admission of a driving record and prior conviction for DWR sufficient evidence to affirm a DWR conviction).

Turning to legal relevance, something is legally relevant if its probative value outweighs any prejudicial effect. *State v. Bowen*, 619 S.W.3d 620, 626 (Mo. App. S.D. 2021). Salsman claims the probative value of the 2015 DWR conviction did not outweigh its prejudicial effect because the conviction constituted propensity evidence. Prior bad acts are generally inadmissible to show a defendant's propensity to commit a crime, but such evidence is admissible to show a defendant's intent or absence of mistake. *Id.* at 626. Here, the nature of a DWR charge put Salsman's mental state and absence of mistake at issue. *See* Section 302.321 (requiring a mental state of "criminal negligence"). Salsman's 2015 DWR conviction was

22

therefore legally relevant to show whether he knew, or should have known, his license was revoked and to dispel the notion Salsman mistakenly believed his license was valid.

The trial court also sufficiently removed any unfair prejudice by admitting the 2015 conviction via stipulation. The State sought to introduce the 2015 DWR conviction for the narrow purpose of proving Salsman's mental state. In response, and per the stipulation of the parties, the trial court informed the jury of Salsman's license revocation in 1997 and subsequent DWR conviction in 2015 by reading a short factual statement. This method minimized the risk of potential prejudice from a witness testifying to those same facts. *See **State v. Williams***, 548 S.W.3d 275, 290 (Mo. banc 2018) ("The danger of unfair prejudice . . . was minimized, however, because the defense and the [S]tate agreed to prove [the defendant's] prior criminal act by way of a short, dispassionate stipulation."); *see also **City of Kansas City v. Johnston***, 778 S.W.2d 321, 324 (Mo. App. W.D. 1989) (holding a trial court "properly" abated the prejudice of a defendant's driving record with "extensive" redactions by admitting a portion of the record through testimony).

Moreover, Salsman has also not demonstrated there is a "reasonable probability" the jury would have reached a different result without the admission of his 2015 DWR conviction. *See **Morgan***, 674 S.W.3d at 502. We cannot say there is a reasonable probability the jury would have reached a different result had the trial court not informed it of Salsman's 2015 DWR conviction because the jury would have still heard the uncontested fact that Salsman's license had not been reinstated "since 1997." Point V is denied.

**Conclusion**

Salsman's points on appeal are denied. The trial court's judgment convicting him of the class B felony of DWI under section 577.010 (Count I) and the class E felony of DWR under section 302.321 (Count II) is affirmed.

JENNIFER R. GROWCOCK, J. – OPINION AUTHOR

MARY W. SHEFFIELD, J. – CONCURS

BECKY J.W. BORTHWICK, J. – CONCURS